COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss

Superior Court
CRIMINAL
NOS. 1975-90504-10

Commonwealth

V.

John Blodgett

## PRO SE DEFENDANT'S AFFIDAVIT IN SUPPORT OF RULE 30 MOTION

Now comes your affiant and upon oath deposeth the following:

1.) My name is John Blodgett, and I am the Pro se defendant in the above
captioned case. I am incarcerated at Old Colony Correction Center in
Bridgewater, MA 02324.

2.) The night of the murder of John Asinari and the attack of Robert Moses, I was
drinking in a tavern called Barney Grogan's. I was asked to leave the
premises after getting into an argument. At this point I realized my car keys,
along with my apartment keys were missing. I had to then take a cab home.
Because I had no apartment key, I had to climb into a window.

3.) The car of which my keys had been taken was one that I had stolen a few
weeks before when the owner left the keys in the ignition.

4.) Before I had been asked to leave Barney Grogan's I encountered an
acquaintance of mine, Robert Shaughnessy who was also drinking at Barney
Grogan's. Given the knowledge that Shaughnessy wound up in the car later
that night, and he was in my circle of acquaintances that stole cars — both from



2

their owners, and from other car thieves, I surmise that Shaughnessy stole my car keys, along with my other keys on the chain.

5.) Although I drove the car in question to Barney Grogan's that was the last time I laid eyes upon that car. I absolutely did not drive the car during the commission of these crimes.

6.) I am not the person who drove during these crimes, and I did not participate in the murder of John Asinari, nor in the crimes against the person of Robert Moses.

7.) When I awoke in my apartment someone telephoned me to tell me that the stolen car I had been driving for weeks had been used in serious crimes. Fearing that I would be blamed because many people knew I was driving the stolen car back and forth to work every day, I fled the state.

Sworn under pain and penalty
Or perjury this _1st_ day of
____June____ 2016.

John Blodgett Pro se
OCCC
1 Administration Road
Bridgewater, MA 02324

## COMMONWEALTH OF MASSACHUSETTS

*Following submission of additional Appendix by the defendant, Commonwealth to Respond to This motion within 60 Days, No later than February 3, 2017*

Suffolk, ss

Commonwealth

V.

John Blodgett

Superior Court
CRIMINAL
NOS. 1975-90504-10

*Rush J.*
*12/5/2016*

### PRO SE DEFENDANT'S SIXTH MOTION FOR POST CONVICTION RELIEF RULE 30

Now comes your Pro se defendant moving to vacate judgements in this case and grant him a new trial under the provisions of Mass Rule Crim. Proc. 30. In support of this motion he submits a supporting memorandum of law. Defendant Blodgett also moves that the Court compel the Committee for Public Counsel Services to assign counsel for him, or that alternate counsel be appointed for Blodgett under **SJC Rule 3:10 section 1(g) 2.**

The Issues

1.) The prosecution team in the person of Boston detectives, and A.D.A. John Gaffney did not preserve, or more likely conceled, exculpatory identification evidence that presents an actual innocence under **Brady** v **Maryland**. Blodgett's sole theory of defense was one of honest but mistaken identity, and there is a substantial risk of miscarriage of justice.

2.) A case of first impression for Massachusetts where prosecution under joint venturer theory was improper and constitutionally infirm. Principal in the joint venture suicided before he went to trial. Where it is Massachusetts and Federal practice to abate indictment of accused if he dies before his direct appeal is heard, dead principal's right to counsel, and Blodgett's right to unconflicted counsel and his Confrontation rights were grossly violated.

Respectfully,

*John Blodgett*

John Blodgett Pro se
OCCC
1 Administration Road
Bridgewater, MA 02324



| | DOCKET NUMBER | Trial Court of Massachusetts |
|---|---|---|
| **CLERK'S NOTICE** | 7584CR90504 | The Superior Court |

| CASE NAME: | Maura A. Hennigan, Clerk of Court |
|---|---|
| **Commonwealth vs. John J. Blodgett** | |

TO: John J. Blodgett, Pro Se
OCCC
i Administration Road
Bridgewater, MA 02324

**COURT NAME & ADDRESS**
Suffolk County Superior Court - Criminal
Suffolk County Courthouse, 14th Floor
Three Pemberton Square
Boston, MA 02108

You are hereby notified that on 12/05/2016 the following entry was made on the above referenced docket:

**Endorsement on   Pro Se Defendant's sixth motion for post conviction relief rule 30, (#67.0):  Other action taken**
**Endorsed as follows: Following submission of additional appendix by the Defendant. Commonwealth to respond to this motion within 60 days no later than Feb 3, 2017. Roach, RAJ (copy of endorsement to ADA J. Campbell and Defendant pro-se).**

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 12/08/2016 | Christine M Roach | (617)788-8160 |

Date/Time Printed: 12-08-2016 14:57:25

SCR016\ 06/2014



Maura Hennigan
Clerk-Magistrate
Suffolk County
Three Pemberton Sq.
14th floor
Boston 02108                          April 25, 2017


RE:    Comm v John Blodgett Pro se
       Nos. 7584CR90504-510


Dear Magistrate Hennigan,

     Enclosed is my Pro se notice of appeal, motion to proceed
in forma pauperis on appeal (which you can allow under MRAP 12(a)
and 12(b), and incorporated is a request for another item under
your discretion, the Supreme Judicial COurt rules (3:      ) permit
the trial court to appoint a third or fourth year law student to
assist an indigent defendant with pleadings.   I could
certianly use the help.    The certificate of service is
incorporated into the motion.


Sincerely,

John Blodgett Pro se
OCCC
1 Administration Rd.
Bridgewater, MA 02324



Attorney Jonathan Shapiro
W & G, LLP
90 Canal St.
Suite 500
Boston, MA 02114                    April 29, 2016

RE:   Comm v John Blodgett; Suffolk, ss  1975-90504-10
      Your'e being ordered off my case in 1977 because of
      the Court's erroneous reliance on former rule 95
      requiring attorney 10 years experience criminal defense
      for a murder 1st case.

Dear Attorney Shapiro,

    I hope you remember my case and your involvement in it at
various stages.    When I got extradited from Texas in 1977 you
were ordered off my case by the judge because he mistakenly
believed you needed 10 years experience in criminal practice
under the old rule 95.   May 8, 1976 the rule was amended to
(rule 53) essentially striking the 10 year requirement.   You
argued with the judge about this.   I remember it, and maybe
someone in my extended family in the courtroom that day may
remember it.
    Whether its an issue today in 2016 I'm not sure.    Theres
lots of cases that say an indigent defendant has no right to
counsel of his choice- whereas a non indigent defendant can,
within reason without being dilitory insist on counsel of his
choice and its reversible error not to allow him said choice.
You argued forcefully that you were qualified and the judge
erroneously insisted you were not.   What do you think of that
as a collateral attack issue ?
    There are inmate friends in here that study law, and we
have identified some seemingly worthy issues.   If you are
willing to look at what we have written and get back to me,
I will send you a copy of the prospective pleadings.   I'm
not including it now because it is voluminous and if you don't
have the time or resources right now it wouldn't be right to
just dump a large bundle of paper on your desk.   Ideally what
I am hoping for is that like the pleadings and decide to re-
promote the case to CPCS with yourself as appointed counsel under
their auspices.   CPCS did originally assign David Keighley to
screen the case years ago- he claimed he found nothing of merit.
Last year I submitted a rough draft of the pleadings to Donald
Bronstein, and he sent it again to David Keighley, who, in my
opinion, rather than admit he missed something significant, made
a dishonest assessment to cover his error.

The Isssues:

The first is a major Bradyissue.

2. ⑦

Specifically the pattern of deceit by the prosecution team, in concealing three photos of a man whom the surviving victim Robert Moses first selected as the driver of the car involved. We have highlighted the steps in the record where the victim himself lied, and when confronted with his previous testimony at my dead co-defendant's hearing, he admitted he had indeed ID'd someone else as the driver, and then made lame excuses on the stand to cover his dishonesty.   Detective Childers was in the deceitful scheme fully.   This whole issue was preserved by two exceptions and a lengthy sidebar motion for mistrial.

The second issue would be a first of its kind in Massachusetts to challenge joint venturer prosecution where the principal had died before trial- therefore his indictment had abated. What was left was an unofficial trial of my co-defendant without his being represented by counsel or being able to testify to refute the hundreds of statements and references to his speech and actions that night.   My trial counsel was unsure of his standing to object on my co-defendant's behalf, and in fact the judge shut him down on that score.   My counsel being burdened with unofficially representing my co-defendant diminished his effectiveness in representing me.   My co-defendant was the unprotected backdoor through which I was convicted as his joint venturer to murder.

    Please let me know if you want to look at the pleadings we drafted.


Sincerely,



John Blodgett W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324





*The Commonwealth of Massachusetts*

*Committee for Public Counsel Services*

*44 Bromfield Street, Boston, MA 02108-4909*

**Anthony J. Benedetti**
CHIEF COUNSEL

TEL: (413) 588-5075
FAX: (413) 586-0658

**NANCY T. BENNETT**
DEPUTY CHIEF COUNSEL
PRIVATE COUNSEL DIVISION

May 5, 2016

Francis Benjamin W104805
Old Colony Correctional Center
1 Administration Rd.
Bridgewater, MA 02324

RE: Commonwealth v. Olszewski

Dear Mr. Benjamin:

While I am flattered by you interest in a brief I drafted over 30 years ago, I am sorry to say I do not have an intact copy I can duplicate for you. I also have not retained a copy of the computer file, and even if I had, I would need to find an Apple computer from the early 1980's to print it out.

This is no great loss, however, when you consider that all of the case law cited in that brief is even more out-of-date than the computer with which it was created. The brief would not do you much good now, as there are many much more recent cases dealing with all of the issues we raised. Furthermore, because I was a novice appellate attorney in those days, the brief itself was kind of a mess, running to several hundred pages. I was ignorant the page limit clearly set forth in the court rules, and was sternly reprimanded by Justice Liacos for being "unduly prolix."

We won that case because the government misconduct was so blatant. The details are set forth plainly in the SJC's decision for you to see. The only real contribution to the development of "lost evidence" law in Olszewski, if I remember correctly, was to make it clear that misconduct leading to the loss or destruction of evidence need not be intentional in order to entitle a defendant to relief. I suggest you read the more recent cases that cite Olszewski.

Very truly yours,

Terry Nagel
Senior Staff Counsel
Private Counsel Appeals Unit

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss

Superior Court
CRIMINAL
NOS. 1975-90504-10

75-90506

Commonwealth

V.

John Blodgett

### PRO SE DEFENDANT'S MOTION TO APPOINT COUNSEL

CPCS has already screened defendant Blodgett's case three and a half years ago (done by attorney David Keighly). More recently Blodgett with assistance of other prisoners identified the instant issue for new trial, and submitted the rough draft to CPCS for screening. Once again it was relegated to David Keighly whom gave some pretty disingenuous answers to CPCS senior counsel Terry Nagel, (briefed in full in the memorandum of law in support of Rule 30 motion).

The defendant asks the Court to review the case de novo, and evaluate whether CPCS should be compelled to supply counsel (in the person of Victoria Kelleher), or appoint alternate counsel pursuant to **SJC Rule 3:10 1(g). and 2.**

Blodgett brings a genuine case of miscarriage of justice, and de novo review is warranted.

Respectfully,

John Blodgett Pro se
OCCC
1 Administration Road
Bridgewater, MA 02324

John Blodgett,W-36184
Old Colony Cor. Cntr.
1 Administration Rd.
Bridgewater,MA.02324-3230

July 1,2016

Mr.Terry Nagel
Seior Staff Counsel
Private Appeals Unit
Committee for Public Counse Services
44 Bromfield St.
Boston, MA.02108-4909

RE: COMMONWEALTH VS. BLODGETT 75-90504-10

Dear Mr.Nagel:

On June 30,2016 I received notification from Suffolk Superior Court that a recent motion for appointment of counsel regarding a pro-se rule 30 in the above mentioned docket has been allowed to the extent that the matter be referred to CPCS for screening. About three and one half years ago I wrote to CPCS regarding the possibility of pursuing post conviction releif. The matter was referred to Attorney David Keighly for screening. At that time Attorney Keighly gave a negative report. More recently I sent a rough draft of the enclosed to CPCS and it also was sent to Attorney Keighly and once again he gave a negative report based on an inacurate analysis of the argument. It is my hope that you will consider Victoria Kelleher, 227 Lewis Wharf,Boston,Ma. 02110 (978-744-4126) as the screening attorney. I have had conversations with MS. Kelleher concerning this matter and she has expressed some interest. If not Ms Kelleher I would ask that you would appoint a new attorney that would give the issues set forth in my motion a fresh look.

In April of this year a friend of mine wrote you a letter requesting any data you might have preserved in the matter of Comm. vs. Olszewki. He was seeking this information because Olszewski so closely resembled my lead issue concerning missing and/or destroyed evidence. Mr. Nagel I implore you to examine my breif, I am appealing to your sense of justice. I know in my heart that if your veteran eyes review the brief you will be convinced that it has merit and should receive the benefit of trained counsel. You told my friend Francis Benjamin in your letter that even a novice can have a winning argument. With the refinement of an experienced attorney chances of success would be greatly increased.

I thank you in advance for your time and any consideration that you may extend this request and it is with positive anticipation that I hope to hear from you soon.

Sincerely Yours,

John J.Blodgett

Victoria Kelleher
Attorney at Law
15 Church St.
Salem, MA 01970                       Sept. 2, 2015


RE:   Com v John Blodgett Suffolk, ss   superior ct. nos.
                                        1975-90504-10


Dear Attorney Kelleher,

    You told me to recommend the case to Donald Bronstein,
and mention your name.   Enclosed is the letter I wrote to
attorney Bronstein and the motion with supporting memorandum
of law.   I did not make an affidavit because I think I would
like to wait to see if CPCS appoints me counsel so I can be
advised on that.



Sincerely,

John Blodgett
OCCC
One Administration Rd.
Bridgewater, MA 02324

Attorney Jonathan Shapiro
W & G, LLP
90 Canal St.
Suite 500
Boston   02114                    April 28, 2016


RE:   Comm v John Blodgett   Suffolf ss 1975-90504-10


Dear Attorney Shapiro,

   I am hoping you remember my case.   When I was extradited
from Texas in 1977 you were my lawyer.   The judge said you were
not qualified to be my attorney, and you argued that yes you were.
The judge prevailed.   I am uncertain if there's an issue, but
right to counsel of choice might apply.   The rule was # 95
which became amended in 1977, so I am assuming thats why you
argued with the judge.
   Right now we (the jailhouse lawyers) have put together a
rule 30 motion and supporting memorandum of law.   I have not filed
it yet.   CPCS screened it (Attorney David Keighley) but he gave
a dishonest and misleading assessment to Terry Nagel. If you are
willing to review the prospective pleading in the hopes of you
re-promoting the case to CPCS I can send it to you.
   It contains two issues:

The first is a major <u>Brady</u> issue.   A pattern of deceit from
the prosecution team where they concealed the fact that the
surviving witness first identified 3 photos of somebody else
as the driver of the murder car.   Why no appellate attorney ever
shouldered this worthy issue I don't know.   I had to include the
tainting of the witness recollection theory in conjunction.

The second would be the first of its kind challenge to joint
venturer prosecution in Massachusetts where the principal had
died before trial and therefore his indictment abated.   What
was left was an unofficial trial of my co-defendant without his
having counsel and right to testify.   My own counsel was uncertain
as to his standing to object on my dead co-d's behalf, and in
fact the judge shut him down on that score.   He (my co-defendant)
was the unprotected backdoor thru which I was convicted as
joint venturer in murder.

   Please let me know.



Sincerely,



John Blodgett W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324

3. (15)

So I am saying that both Shaughnessy's right to counsel was violated and mine because Balliro could not reasonably focus on defending me while he had to keep stepping in (but not too consistently) to defendant Shaughnessy.   Shaughnessy's rights were laid bare, and I as joint venture took the weight for a murder committed by him.

Therefore I say that the rule in Massachusetts vacating the indictment of a defendant if he dies before direct appeal is not merely a weak judicial entitlement, but it has substantive rights as its constitutional underpinning.   In sum, I would or I should be the first in Massachusetts to reap the fruits of this case of first impression and I ask that when you promote my case to the Innocence Project or Innocence Program, that you include this on the coattails of the actual innocence issue on the Brady violation in the ID process.

Sincerely,


John Blodgett W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324



# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss

Superior Court
CRIMINAL
NOS. 1975-90504-10

Commonwealth

V.

John Blodgett

## PRO SE DEFENDANT'S MOTION TO APPOINT COUNSEL

CPCS has already screened defendant Blodgett's case three and a half years ago (done by attorney David Keighly). More recently Blodgett with assistance of other prisoners identified the instant issue for new trial, and submitted the rough draft to CPCS for screening. Once again it was relegated to David Keighly whom gave some pretty disingenuous answers to CPCS senior counsel Terry Nagel, (briefed in full in the memorandum of law in support of Rule 30 motion).

The defendant asks the Court to review the case de novo, and evaluate whether CPCS should be compelled to supply counsel (in the person of Victoria Kelleher), or appoint alternate counsel pursuant to **SJC Rule 3:10 1(g). and 2**.

Blodgett brings a genuine case of miscarriage of justice, and de novo review is warranted.

Respectfully,


John Blodgett Pro se
OCCC
1 Administration Road
Bridgewater, MA 02324

COMMONWEALTH OF MASSACHUSETTS                    (17)

Suffolk, ss                                    . Superior Ct. Crim.
                                          Nos. 7584CR90504-510


Commonwealth


v


John Blodgett Pro se


PRO SE DEFENDANT'S MOTION FOR EXTENSION OF TIME UP TO AND
INCLUDING June 12, 2017

   Now comes your Pro se defendant moving this Honorable Court
to grant him an extension of time to respond to "Commonwealth's
Opposition to Defendants Motion for New Trial" up to and
including June 12, 2017.  Because of the strictures of prison
pleading preparation, your defendant requests that this motion
do double duty as a sworn statement as well.
For reason:

*   · The Commonwealth sought and was granted an enlargement of
     time until March 31st 2017.  Without having filed for
     further extension, she defaulted until April 4th 2017
     and then compounded the pejudice by delaying mailing to
     the defendant- He received his copy of their opposition
     April 11, 2017.

*   The gravamen of the Commonwealth's rationale is that
     CPCS screening counsel David Keighly found no appealable
     issue, BUT in fact no prior counsel has ever raised the
     MAJOR Due Process violation from the sound and never tried
     Brady violation.  The Commonwealth attempts to meld the
     loosely associated assignment of error 12, and 13 which
     did not articulate even remotely a Brady violation.
     Further the Commonwealth asserts by omission that the SJC
     already having done review under c 278 § 33E means that
     the Justices were infallible.  Judges are not detectives.
     They tend to rule on the evidence and issues presented
     by counsel.  Further, CPCS screening counsel David
     Keighly plainly lied in his written assessment of the case,
     and he was arguably covering his previous screening done
     some years before Blodgett submitted the instant pleading.

*   Blodgett's burden is huge, and he needs the additional
     time to adequately counter the false assertions; therfore
     the additional time is not excessive.

*   Blodgett's first issue is an issue of actual innocence.

2.    (18)

\*    Blodgett's second issue is a novel question of law, which
in contravention to Commonwealth's assertion would prove
"onerous" and a "burden on society" really would be a
narrowly tailored limit on joint venture prosecutions.
Commonwealth's over-simplification of these proposals
on issue two are an attempt to mask the major constitutional
infirmity that occurred in Blodgett's case, not an avalanche
of other Massachusetts cases.    Blodgett requests the judge
read his memorandum of law, and grant the extension for
further briefing on this novel question of law.


Respectfully Sworn under pain
and penalty of perjury,

John Blodgett Pro se
OCCC
1 Administration Rd.
Bridgewater, MA 02324



Certificate of Service

I John Blodgett, the Pro se Defendant, hereby certify that
I did serve by first class mail upon Julianne Campbell ADA
Suffolk Co. One Bulfinch Place Boston MA 02114 one copy
of this motion/affidavit for extension of time.



Date: April 12, 2017    .    Signed:

(19)

November 18, 2015

Terry Scott Nagel
CPCS Senior Staff Counsel
44 Bromfield St.
Boston, MA 02108-4909



Re:    *Commonwealth v. John Blodgett*
        SUCR1979-90504

Dear Mr. Nagel:

        This letter is my response to your October 6, 2015, letter to me requesting that I comment on the reasonable likelihood of success with regard to two issues that the defendant, John Blodgett, proposes for inclusion in what would be his sixth Rule 30 motion. The merits of those issues are addressed below.

        First, Mr. Blodgett claims that the prosecution willfully destroyed identification evidence, in the form of 3 photographs, supposedly showing that he was not one of the two coventurers (that is to say, Mr. Blodgett was not the driver of the car in which the assaults upon the victims began) who participated in the murder of one of the victims. To support this claim, Mr. Blodgett asserts that while in the hospital immediately after the attack, the surviving victim, Robert Moses, picked 5 photographs, 3 of which Moses supposedly said was the man who actually drove the car.

        On this claim, Mr. Blodgett also asserts that the prosecution knowingly used false testimony from Boston police officer Russell Childers, who testified at a pretrial evidentiary hearing on Moses's photographic identification of Mr. Blodgett. At that hearing, Officer Childers testified that on March 23, 1975, while in the hospital, Moses was shown 8-10 pages of a mugshot book, containing a total of about 60 photographs. [Tr. 1/20-26]. According to Mr. Blodgett, Officer Childers's testimony is false because Moses testified on cross-examination at trial that the police had shown him 200 photographs, 5 of which he apparently selected as possible suspects. [Tr. 4/92]. Mr. Blodgett claims that Officer Childers deliberately understated the number of photographs shown to Moses to make it appear that he was not alert at the hospital; the unstated but implied premise being that Officer Childers understated the number of photographs in order to depict Moses as not sufficiently alert to identify a possible suspect from the photographs the police intended to show him on that first occasion at the hospital.

        Contrary to Mr. Blodgett, my notes of the trial court transcripts do not support his claim that the prosecution willfully destroyed identification evidence, that Officer Childers gave false

1

40

(20)

testimony or that Moses identified the driver of the car when first shown photographs at the hospital on March 23, 1975. During the evidentiary hearing on the photographic identification, Officer Childers testified that Moses was shown 200 photographs from a mugshot book, but, because Moses was medicated and not responsive, he actually looked at 8-10 pages of the mugshot book containing about 60 photographs. [Tr. 1/20-26]. The clear import of this testimony is that the police probably intended to show Moses the 200 photographs contained in the mugshot book, but stopped at 60 because he was medicated and unresponsive. Officer Childers also testified at the evidentiary hearing that, four days later, on March 27, 1975, the police showed Moses 13 photographs, which were admitted into evidence at the hearing, and at that time he identified Mr. Blodgett. [Tr. 1/28-30, 50]. At trial, Officer Childers repeated that testimony. [Tr. 4/142-143].

Moreover, at trial, Moses testified that on March 23, 1975, while in the hospital, he selected 5 photographs from the 200 shown to him by the police, but did not identify Mr. Blodgett from any of those photographs. [Tr. 4/92, 98]. However, when the police later showed Moses photographs at the hospital, he identified Mr. Blodgett. [Tr. 4/72-73]. Thus, my transcripts notes reflect that, from all of the photographs shown to Moses on two occasions at the hospital, the only person he ever actually identified as the driver of the car was Mr. Blodgett. Moreover, Moses did not identify the driver when the police initially showed him photographs on March 23, 1975.

Regarding this claim, the only discrepancy, if indeed there is one, is the difference between Officer Childers's evidentiary hearing testimony that Moses looked at 60 photographs at the hospital on March 23, 1975, before stopping due to his unresponsive, medicated state, and Moses's trial testimony that the police showed him 200 photographs that day. That discrepancy does not mean that Officer Childers lied at the evidentiary hearing, particularly when the officer also made reference at that hearing to Moses being shown 200 photographs. [Tr. 1/24]. Indeed, the discrepancy can be readily explained by reasonably inferring that the police intended to show Moses 200 photographs, but stopped at 60 for the reason noted above.

In short, Mr. Blodgett does not show that any impropriety in the identification procedure occurred or that Officer Childers lied at the evidentiary hearing. Furthermore, Mr. Blodgett points to no place in the record, and my transcript notes contain no such reference, which shows that the prosecution deliberately destroyed the 5 photographs Moses selected during his initial viewing of photographs on March 23, 1975. Thus, based on my current knowledge of the record in this case, I believe that Mr. Blodgett can make no headway on his identification claim.

Mr. Blodgett's second issue involves what is, in his words, a case of first impression in Massachusetts. By way of background, the charged coventurer in this case, Robert Shaughnessy, hanged himself while in custody nearly two years before Mr. Blodgett's trial, resulting in the charges being dropped against Shaughnessy. Based on that circumstance, Mr. Blodgett proposes a new rule of law in Massachusetts, one in which his conviction as a joint venturer to murder would be invalidated because, upon Shaughnessy death, no coventurer existed with whom Mr. Blodgett could be found jointly culpable for the death of one of the victims.

2

41

(21)

Mr. Blodgett's proposal requires little comment. It is impossible to imagine that Massachusetts or any other jurisdiction would ever adopt such a dangerous rule. Indeed, under such a rule, in a case involving two alleged coventurers, the Commonwealth would be required to drop charges against one alleged coventurer to a crime, however serious, upon the death of the other alleged coventurer, assuming the coventurer's death occurred during the pendency of the surviving coventurer's case in the trial court and perhaps even on direct appeal. Put simply, if adopted, Mr. Blodgett's proposed new rule would wreck the law of joint venture, provide an utterly bizarre windfall to the surviving coventurer and impose an onerous burden on society.

In my view, Mr. Blodgett's two current arguments lack merit and, if presented in a new trial motion, would have no chance of success. If I can assist you further in this matter, please feel free to contact me.

Very truly yours,

_____

David Keighley, Esq.

3

42

| CLERK'S NOTICE | DOCKET NUMBER<br><br>7584CR90504 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

CASE NAME:

**Commonwealth vs. John J. Blodgett**

Maura A. Hennigan, Clerk of Court

TO:

John J. Blodgett
OCCC
1 Administration Road
Bridgewater, MA 02324

COURT NAME & ADDRESS

Suffolk County Superior Court - Criminal
Suffolk County Courthouse, 14th Floor
Three Pemberton Square
Boston, MA 02108

You are hereby notified that on 04/13/2017 the following entry was made on the above referenced docket:

Endorsement on   Pro Se Defendant's Sixth Motion for Post Conviction Relief Rule 30, (#67.0):
DENIED
Following Full file review, Motion Denied for the reasons stated in the Commonwealth's Opposition.
The SJC quite clearly reviewed all of the defendant's factual and legal claims about his trial, 377
Mass. 494, 495(1979). The allegedly new claim about the co-ventures fails to raise a substancial issue,
Mass R. Crim P. 30(c)(3).
(Copy of endorsement to Defendant Pro Se and J. Campbell, ADA)

| DATE ISSUED<br><br>04/20/2017 | ASSOCIATE JUSTICE/ ASSISTANT CLERK<br><br>**Christine M Roach** | SESSION PHONE#<br><br>**(617)788-8160** |
|---|---|---|

Date/Time Printed: 04-20-2017 09:04:41

SCR016\ 06/2014

COMMONWEALTH OF MASSACHUSETTS                    (23)

Suffolk, ss                                      Superior Ct.
                                  Crim. Nos. 7584CR90504-510


Commonwealth


    v


John Blodgett Pro se


PRO SE DEFENDANT'S NOTICE OF APPEAL TO THE SINGLE JUSTICE
OF THE SUPREME JUDICIAL COURT


    Now comes your Pro se defendant, who, having been denied relief
in the trial Court of this County, hereby gives notice of appeal
to the single justice of the Massachusetts Supreme Judicial
Court.
For reason:

*    Defendant Blodgett through counsel or Pro se HAS never ever
     articulated a Brady violation in a motion for new trial
     which borders on, or is actually tsructural error.   It
     remains an unaddressed issue amounting to a partial or
     complete denial of Due Process at trial and appellate levels.

*    Defendant Blodgett has raised a substantial issue with
     constitutional underpinning in the Confronation Clause,
     and right to counsel.


Respectfully,

John Blodgett Pro se      W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss
Superior Court
Crim. Nos. 7.584CR90504-510

(24)

*motion Allowed.*

*[signature] Rosen, J*
*5/5/2017*

Commonwealth

v

John Blodgett Pro se

## PRO SE DEFENDANT'S MOTION TO PROCEED IN FORMA PAUPERIS ON APPEAL

Mass. Rule of App Proc. 12(a) and 12(b) permit the trial Court to allow an indigent prospective appellant to proceed in forma pauperis on appeal. John Blodgett only earns $10.00 per week which is augmented by occasional gifts from family and friends. Out of which he must pay for soap, toothpaste, stamps, envelopes, sneakers, some kinds of clothing, coffee, ect.

He therefore appeals the judge or the Clerk magistrate of this Court to allow him to proceed in forma pauperis on appeal. He also requests that the Clerk Magistrate assemble the record on appeal, and consider appointing a third or fourth year law student to assist him with his pleadings (under the rules of the Supreme Judicial Court this Court may do so).

Respectfully,

*[signature]*

John Blodgett Pro se
OCCC
1 Administration rd.
Bridgewater, MA 02324

Certificate of Service:
I John Blodgett, the Pro se defendant now appellant, hereby certify that I did serve by first class mail upon Julianne Campbell ADA for Suffolk County One Bulfinch Place Boston 02114 one copy of the notice of appeal and motion to proceed in forma pauperis on appeal.

Date:
4/25/17

Signed: *[signature]*

Clerk's Office
Suffolk County
Criminal Business
3 Pemberton Sq.
Rm 1403
Boston 02108                         April 12, 2017


RE:  Comm v John Blodgett Pro se
Nos. 7584CR90504-510


Dear Sir or Madam Clerk,

    I just received the Commonwealth's opposition April 11th,
yesterday.  If the judge has already ruled, please present
this pleading for extension of time.  I have meritorious
claims, and I have a huge burden of proof.  The ADA's
mischaracterization was harmful and I will have to present a
reply memorandum and I will need time.
    The certificate of service is incorporated.


Sincerely,

John Blodgett Pro se
OCCC
1 Administration Rd
Bridgewater, MA 02324

| **CLERK'S NOTICE** | DOCKET NUMBER<br><br>7584CR90504 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| CASE NAME:<br><br>**Commonwealth vs. John J. Blodgett** | Maura A. Hennigan, Clerk of Court |
|---|---|

| TO:<br>John J. Blodgett<br>OCCC<br>1 Administration Road<br>Bridgewater, MA 02324 | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Criminal<br>Suffolk County Courthouse, 14th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |
|---|---|

You are hereby notified that on 05/05/2017 the following entry was made on the above referenced docket:

**Endorsement on Motion to Proceed in Forma Pauperis on Appeal, (#76.0): ALLOWED (Copy and Notice Sent to Deft Pro Se)**

SUC Rule 3:03(1)(b)

| DATE ISSUED<br><br>**05/05/2017** | ASSOCIATE JUSTICE/ ASSISTANT CLERK<br><br>**Christine M Roach** | SESSION PHONE#<br><br>**(617)788-8160** |
|---|---|---|

Date/Time Printed: 05-05-2017 16:16:20      SCR016\ 06/2014

E          C     (27)

Pro se Clerk
Suffolk Superior Criminal Court
Three Pemberton Sq.
Rm 1403
Boston, MA 02108                          June 28, 2017


RE: Comm  v   John Blodgett Pro se
    Nos 1975-90504-10


Dear Sir or Madam Clerk,

    It seems that it is taking an unusually long period of
time to assemble the record on appeal.  If there is something
wrong, please tell me.  I would appreciate any concern you
might address to expedite the assembly of the record to the
SJ session of Suffolk County (Maura Doyle).


Sincerely,

John Blodgett Pro se
W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324

2017 JUL -3 PM 12: 55

E          D    (28)

COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE CLERK MAGISTRATE
MAURA A. HENNIGAN
THREE PEMBERTON SQUARE
ROOM 1403
BOSTON, MASS. 02108

SUFFOLK, s.s.

Dear Sir or Madam:

The enclosed request(s) and/or motion(s) is/are being returned for the following reason(s):

_____    No docket number(s):

_____    Motion(s) not signed:

_____    Not a Suffolk Superior Criminal Case:

_____    Not compliance with Mass. Rules for Criminal Procedure
             Rule No._____

___✓___    Other*    Mittimus are not public record. This paperwork cannot
                      be copied.

Note: Mr Blodgett,
      You must file your
appeal to the single Justice
directly to that Court. Sorry.
If there were a misunderstanding

`D
(29)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No. SJ-2017-0278

Suffolk Superior Court
No. 7584CR90504

COMMONWEALTH

v.

JOHN J. BLODGETT

ORDER DENYING LEAVE TO APPEAL

This matter came before the Court, Cypher, J., on the defendant's application pursuant to G.L. c. 278, § 33E, for leave to appeal from the Suffolk Superior Court's order of April 13, 2017 denying the defendant's sixth post-conviction motion for a new trial in docket number 7584CR90504.

As a preliminary matter the defendant filed the gatekeeper application beyond the applicable thirty day deadline. See Mains v. Commonwealth, 433 Mass. 30, 36 n. 10 (2000). The defendant has not filed a motion to extend the deadline.

Upon consideration, it is ORDERED that the defendant's gatekeeper application be, and hereby is, DENIED, without hearing on the separate and independent grounds that it presents no substantial question warranting determination by the full court nor demonstrates that there is a substantial likelihood of miscarriage of justice. See Commonwealth v. Jackson, 471 Mass. 262, 269 (2015).

By the Court, (Cypher, J.)

Assistant Clerk

August 21, 2017

Entered:

*E*    (31)

Maura S. Doyle, Clerk
Massachusetts Supreme Judicial Court
Suffolk County
John Adams Courthouse
One Pemberton Sq.
Suite 1300
Boston MA 02108-1707                    Aug. 25, 2017


RE: SJ-2017-0278


Comm v John Blodgett Pro se


Dear Ms. Doyle,

    I received the order of the Single Justice dated Aug. 21st
2017 yesterday.   In order to clear up some factual discrepency
and press the issues which have merit I respectfully submit the
enclosed motion for the Single Justice to reconsider and
attchments A,B,C,D and certificate of service.   Please place
it before Single Justice Cypher.


Sincerely,

John Blodgett Pro se
W36184
OCCC
1 Administration rd.
Bridgewater, MA 02324

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT



From a judgement:
Suffolk, ss
7584CR90504-510

Single Justice Nos.
SJ-2017-0278

Commonwealth

v

John Blodgett Pro se

PRO SE DEFENDANT'S MOTION TO RECONSIDER ORDER OF August 21, 2017
(Cypher, J.)

Now comes your Pro se defendant requesting of this Honorable

Court to reconsider the order of August 21, 2017 (Cypher, J)

denying him leave to appeal to the Full Court.

For reason:

1.)    The trial court never mailed him or he never received any

notice that the record was assembled.    The thirty time limit is

triggered by the assembly of the record.    Defendant Blodgett

was in constant contact with the Court, (attachment A motion

to proceed in forma pauperis on appeal dated April 25, 2017),

(attachment B motion to proceed in forma pauperis on appeal

allowed May 5, 2017) (attachment C  letter to court from Blodgett

enquiring why it was taking so long to assemble the record dated

June 28, 2017, stamped received July 3, 2017)(attachment D a

memo from unidentified clerk at court:"You must file your appeal

to the single justice directly to that Court.    Sorry if there

were a misunderstanding.")

Whereupon Blodgett realized that the record had been assembled

without notifying him and he promptly filed the pleadings he had

E                                                2.    (33)

already prepared and waiting to go.    Blodgett did not file any motion to extend time because he had no time post from the trial court as to when the assembly of the record had taken place.

2.)    As for a new and substantial question; Blodgett has brought one issue of material, an egregious Brady violation.    The United States Supreme Court has identified this type of error as structural, United States v Bagley 473 US 667.(1985) as log as the disclosure of the exculpatory evidence would have produced a different result.

Blodgett had also brought an issue that has never been tried in Massachusetts ever under the clairvoyant exception.    How could he be faulted for not bringing the issue earlier when no case ever addressed the issue?    It has constitutional under-pinnings and it is substantial.

Conclusion:

The Single Justice should reconsider Blodgett's long over-due plea for full review.

Respectfully,

John Blodgett Pro se    W36184
OCCC.
1 Administration rd.
Bridgewater, MA 02324

Certificate of Service:
I John Blodgett the Pro se defendant appellant hereby certify that I did serve upon Julianne Cambell of the Suffolk County D.A.'s office one copy of this motion to reconsider to the single justice and attachments A,B,C,D first class mail.

Date: 8/22/17                          Signed:

'A' (34)

John Blodgett, W-36184
1 Administration Rd.
Bridgewater, MA. 02324

October 7, 2017

Clerk Criminal Division
United District Court Suite 2300
1 Courthouse Way
Boston, Massachusetts 02210

Dear Clerk:

Some time in the 1990's another inmate assisted me in preparing a Habeas Corpus Petition under 28 U.S.C. sec. 2254 by a person in State custody. The petition was dismissed without prejudice. Unfortunately as a result of transfers my copy of the petition has been lost. Therefore it is my hope that you may forward a copy of the docket entries in this regard. The petition was submitted under the heading of "John Blodgett, Petitioner Vs. Paul Murphy Superintendent, Respondent at Old Colony Correctional Center at Bridgewater, Massachusetts 02324".

I thank you in advance for any and all assistance you may extend me in this matter and it is with positive anticipation that I hope to hear from you soon.

Sincerely,

John Blodgett

B (35)

Pro se Clerk
United States District Court
John Moakley Courthouse
One Courthouse Way
Suite 2300
Boston, MA 02210                    Oct. 26, 2017


RE:   Pro se prisoner wishes to file successive petition
      for habeas corpus, but needs copy of previous petition
      to present to First Circuit


Dear Sir or Madam Clerk,

    My name is John Blodgett inmate W36184 at Old Colony Corr
Center in Bridgewater, Massachusetts.   I filed without actually
understanding the contents a petition for habeas corpus in this
court sometime in the 1990's.   Because of the tumultuous nature
of prison life I no longer possess a copy.   But I need a copy
even though it was dismissed without prejudice because I have
to apply for permission to file a successive petition with the
First Circuit Court of Appeals just to file a petition in
US District Court.
    Could you please check the archives for the 1990's for
John Blodgett Pro se    vs   Paul Murphy, respondent?  I will
pay the document fee if required, however, if you can waive it
please do, I've been in a long time.   I have a theory I am
entitled to equitable tolling.


Sincerely,

John Blodgett Pro se W36184
OCCC
1 Administration Rd.
Bridgewater, MA 02324

(36)

S. Boston man denies guilt in Asinari murder
*Boston Globe (1960-1985)*; May 24, 1975; ProQuest Historical Newspapers: The Boston Globe
pg. 16

# S. Boston man denies guilt in Asinari murder

Robert Shaughnessy of South Boston yesterday pleaded innocent in Suffolk Superior Court to a charge of first degree murder in connection with the slaying of MIT student John Asinari of Arlington in March.

Judge Paul A. Tamburello ordered Shaughnessy, 23, of West 3d st., held without bail in Charles Street Jail where he will undergo a psychiatric evaluation.

During the brief arraignment, Shaughnessy's lawyer, Alfred P. Farese, clashed with First Asst. Dist. Atty. John T. Gaffney when the prosecutor referred to Shaughnessy as a "mad dog" and said he should not be allowed bail.

Farese castigated Gaffney for the characterization and argued that Shaughnessy's parents were prepared to put up their house as surety that Shaughnessy would appear for trial.

Asinari, 20, of Emund road, an honor student, died after being shot, beaten and stabbed more than 50 times during an attack by two of four occupants of a car who offered Asinari and a companion a ride to MIT.

The companion, Robert L. Moses, 20, of Roslindale, also an MIT student, identified Shaughnessy as the assailant who stabbed him and Asinari during a ride from Beacon street and Massachusetts avenue, Back Bay, to South Boston on the morning of March 22, 1975.

Moses, who suffered gunshot and multiple stab wounds, made the identification at a probable cause hearing before Judge Lawrence L. Cameron in South Boston District Court on April 4.

George W. Curtis, Suffolk County medical examiner, said Asinari died from skull fractures and a brain laceration sustained when he was clubbed.

Shaughnessy was arrested two days after the incident. On March 27, a murder warrant was issued for the arrest of John Blodgett, 23, of French street, Methuen, alleged to have been the driver of the car used in the murder.

Two other men, who it is believed did not take part in the attack on Asinari and Moses, also are being sought.

Shaughnessy was indicted by a Suffolk County grand jury earlier this month. Shaughnessy also was charged with kidnaping, armed robbery, assault with intent to murder, and assault and battery by means of a dangerous weapon.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Says vehicle had been stolen from him: <span class="hit">Blodgett</span> denies Asinari slaying role
Sheehan, Alan
*Boston Globe (1960-1985)*; Jun 24, 1977; ProQuest Historical Newspapers: The Boston Globe
pg. 1

### Says vehicle had been stolen from him

# Blodgett denies Asinari slaying role

By Alan Sheehan
Globe Staff

John J. Blodgett, 26, denied in Suffolk Superior Court yesterday that he participated in the bludgeon slaying of MIT honor student John L. Asinari, 20, of Arlington on March 22, 1975, in South Boston.

Blodgett admitted that a week earlier he had stolen the car used in the slaying, but denied that he was driving it when Asinari and a college friend were picked up by four men in the vehicle.

Blodgett, a former door-to-door salesman in the Lawrence-Methuen area for Continental Cablevision implied that the car had been stolen from him on March 21 by Robert M. Shaughnessy, 22, of West Third street, South Boston.

He said he met Shaughnessy, whom he had known for eight years while he lived with his family in the D street housing project, in "Barney Grogan's" (now "The Last Venture") in South Boston several hours before the murder.

"He jokingly mentioned to me what I was driving today?" Blodgett said. "I told him I was driving a 1970 Monte Carlo (Chevrolet)." Blodgett, who said

BLODGETT, Page 11

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

38

# Blodgett denies slaying role

★BLODGETT

Continued from Page 1

he "was drunk" that night, testified that he remained in the cafe until about 1 a.m. "when I was asked to leave because I got in an argument."

When he returned to where the car was parked, Blodgett said, he discovered that the vehicle was gone and his keys were missing.

Blodgett is on trial before Judge James P. McGuire and a jury of 10 men and six women.

charged with first-degree murder, the attempted murder of Robert D. Moses, of Roslindale, kidnaping and robbing both men and assaulting Moses with a handgun and a knife.

Moses, 22, a student at Johns Hopkins Medical School in Baltimore, identified Blodgett on Wednesday as the driver of a car, occupied by four men, which stopped for him and Asinari on Massachusetts avenue, Back Bay, at 2:30 a.m. on March 22.

Moses, then a junior at MIT, said Blodgett took his wallet and keys and stabbed him several times while the car was parked on Back street, a short distance from where he and Asinari were picked up.

Moses testified that Shaughnessey, a front-seat passenger, continually slashed him and Asinari with a knife and shot each at point blank range.

Moses said he escaped when the car stopped at Emmet and East Second streets. Asinari, a 6-foot-4 lacrosse player, was attacked by one of the four men and was beaten to death as he lay in a gutter, suffering from more than 50 wounds.

Under examination of his court-appointed counsel, Joseph J. Balliro, Blodgett admitted that he fled the state after he allegedly received an anonymous telephone call on March 22 informing him that the car he stole was involved in the murder. He said he stayed at a Charlestown rooming house until March 26, when he learned that Shaughnessey had been arrested in connection with the murder.

Shaughnessey hanged himself in Charles Street Jail on Nov. 11, 1975, while awaiting trial.

Under cross-examination by Prosecutor John T. Gaffney, Blodgett, conceded that he told two Boston detectives that "I knew at some time it had to end" and "I knew I was going to get caught."

He denied, however, telling the detectives, Sgt. Russell Childers and Joseph Confort, during a flight from Houston, that he "had a better chance — two years later — to beat the case" and that "I only wish it was five years."

Blodgett said he used the alias "Carl William Hoffman" while he worked for a moving and storage firm in Bridgeport, Conn., until Sept. 15, 1975 and later for the same company in Houston, until his arrest in March 7, 1977.

Blodgett, who served a sentence in the Walpole state prison for assault and battery with a dangerous weapon said under cross-examination that he had a criminal record for auto theft.

Blodgett was scheduled to return to the witness stand today.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

69.

(39)

A terrifying ride—then death, jury in Asinari slaying told
Sheehan, Alan
Boston Globe (1960-1985); Jun 17, 1977; ProQuest Historical Newspapers: The Boston Globe
pg. 3

# A terrifying ride — then death, jury in Asinari slaying told

By Alan H. Sheehan
Globe Staff

The bludgeon slaying of MIT junior John L. Asinari of Arlington was preceded by a terrifying car ride in which Asinari was stabbed 50 times and shot by two assailants, prosecutor John T. Gaffney told a Suffolk Superior Court jury yesterday.

Gaffney made those allegations in his opening statement in the trial of John J. Blodgett, 25, charged with first-degree murder, and with the attempted murder of Asinari's college friend, Robert Moses, then 20, of 771 American Legion highway.

Blodgett, formerly of French street, Methuen, also is charged with the armed robbery of both men and with assault and battery with a knife and handgun on Moses.

Gaffney told the 10 men and six women on the jury that Blodgett was driving the stolen car that stopped near the Harvard Bridge on May 22, 1975, to pick up Asinari and Moses, who were hitchhiking to their dormitories at MIT.

Gaffney said Asinari and Moses got into the rear seat of the two-door auto, where two men already were seated.

The passenger in the front seat was identified as Robert Shaugnesssey, 22, of West Third street, South Boston, Gaffney said, adding that Shaughnessey "will not appear before you because he is deceased."

Shaughnessey, an unemployed high school dropout who was arrested two days after the murder, hanged himself in Charles Street Jail on Nov. 11, 1975, while awaiting trial in connection with the murder. The other two men who were in the car have never been identified.

Instead of proceeding down Massachusetts avenue and over the bridge, Gaffney said, Blodgett pulled the car onto Back street, which runs parallel with Storrow drive, and parked.

At that point, Gaffney said, Blodgett pulled a knife on Moses, began "rubbing it up and down his body," and said: "All right, give us your money, let's see what you have." When Moses reached into his pocket, the prosecutor said, Blodgett plunged the knife into Moses' left hand.

Moses offered Blodgett his keys and wallet, Gaffney said, and Blodgett responded by "laughing" and continually stabbing the pre-medical student in the arms and chest.

Shaughnessey continued to stab the 20-year-old Asinari, even after he had passed him the few dollars he had in his pocket, according to Gaffney.

He said Moses will testify that he offered to take the assailants to his dormitory, where he had $40, and that Blodgett responded: "You wish you were back there. You'll never see that place again."

Gaffney said "blood was gushing from both men ... Shaughnessey continually stabbed them, particularly Asinari."

He said the attack took place over a span of 40 to 50 minutes while Blodgett drove through the city.

Gaffney said Shaughnessey took out a .handgun and placed the barrel against Asinari's head and pulled the trigger but the weapon failed to fire. The second time, he said, the gun went off, sending a bullet through Asinari's ear drum.

He said Asinari begged: "Just let me live," moments before he was shot and Moses pleaded: "Don't shoot me. Please let me live.

Asinari's mother, Eleanor Asinari, seated two rows behind the defendant, quietly wept as Gaffney talked. Her husband, Louis, blinked in an effort to hold back his tears. Blodgett, a handsome man with clean-cut features and close-cropped blond hair and wearing a brown three-piece suit, listened intently but displayed no visible emotion.

Gaffney said Shaughnessey turned his attention to Moses and shot him at point-blank range. The bullet struck him on his left elbow, Gaffney said, ricocheted off and struck his right hand as he tried to defend himself.

Moses fell against Asinari, pretending he was dead, Gaffney said.

Gaffney said the ride ended on Emmett street in South Boston about 3:30 a.m., when Asinari and Moses were able to bolt from the car after the occupants of the front seat got out.

Moses ran to a vacant lot on Second street and hid under a pile of boxes. He heard voices yelling: "Get him, get him. Kill him," the prosecutor alleged.

Gaffney said Asinari ran down Second street, chased by at least one person. His pursuer was armed with what appeared to be an auto jack, he said. He said the evidence will show that Asinari was struck on the head with a blunt instrument, a blow that caused his death.

70,

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission



Jury shown photos of slain MIT junior
Sheehan, Alan
Boston Globe (1960-1985); Jun 21, 1977; ProQuest Historical Newspapers: The Boston Globe
pg. 13

# Jury shown photos of slain MIT junior

By Alan Sheehan
Globe Staff

In a procedure rarely used in recent years, color slide photographs of the shot, stabbed and bludgeoned body of MIT junior John L. Asinari of Arlington, who was murdered on March 22, 1975, were shown yesterday to a Suffolk Superior Court jury.

Assistant District Atty John T. Gaffney requested the presentation by Dr. George W. Curtis, Suffolk County medical examiner, in the third day of the first degree murder trial of John Blodgett, 26, formerly of 33 French st., Methuen.

Blodgett also is being tried for kidnaping Asinari and his college friend, Robert Moses, then 20, of 771 American Legion Hway., Roslindale, armed robbery of both men, and assault and battery with a knife and a handgun on Moses.

Curtis' voice was the only sound that could be heard in the darkened ninth floor courtroom when the 11 separate slides were flashed on a small screen located close to the jury box.

Several of the 16 jurors held their hands to their mouths as Curtis, a pathologist for 15 years, pointed to many of the "more than 50 wounds" the 20-year-old Asinari sustained on his head, face, neck, back, chest, and both arms and hands.

Curtis described the wounds on Asinari's head as "gaping lacerations" caused by "strong, severe blows to the head with a blunt instrument" which he said had a "flat surface" or was of "a round cylindrical type."

After the first slide was flashed on the screen, Judge James P. McGuire interrupted the presentation and instructed Deputy Sheriff and Clerk Robert Shone, to place a large blackboard behind the screen to block the photographs from the view of the spectators.

The victim's parents, Louis and Eleanor Asinari of 96 Edmund rd., were seated in the first row directly in back of the projection screen.

Continuing his testimony, Curtis' pointed to a crease on the 20-year-old student's face which he said was caused by a gunshot wound. He said the bullet penetrated Asinari's ear and exited behind the lobe.

Asinari also suffered a severe laceration between the forefinger and the middle finger on his left hand in which the tendons were severed.

Another photograph, one of Asinari's head, showed huge, gaping wounds on the top of his skull.

Curtis said Asinari died "as a result of multiple blows to his head which crushed his skull and macerated his brain."

The slides are vital to the prosecution's case because Gaffney contends that Asinari's slaying was "an extreme atrocity," thus constituting first degree murder.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Charged in Asinari slaying: Blodgett trial jurors hear final arguments"
Sheehan, Alan
Boston Globe (1960-1985); Jun 27, 1977; ProQuest Historical Newspapers: The Boston Globe
pg. A34

### Charged in Asinari slaying

# Blodgett trial jurors hear final arguments

By Alan Sheehan
Globe Staff

Is John J. Blodgett one of the "two mad dogs" who stabbed, shot and finally bludgeoned MIT junior John L. Asinari, 20, of Arlington, to death in South Boston on March 22, 1975?

Or is the 26-year-old Methuen man himself a tragic victim of "as classic a case of mistaken identification as in any case ever presented in the Commonwealth?"

These were the choices offered today to a Suffolk Superior Court jury of 10 men and six women by First Asst. Dist. Atty. John T. Gaffney and Joseph J. Balliro, Blodgett's defense counsels, in their final arguments.

Both lawyers told the jury that the case presented in the last eight days before Judge James P. McGuire turns on the testimony of Robert D. Moses, 22, of Roslindale, a student at Johns Hopkins Medical School.

Blodgett, a seventh-grade dropout, is accused of first-degree murder, the attempted murder of Moses, kidnaping and robbing both Asinari and Moses and assaulting Moses with a handgun and a knife.

Moses identified Blodgett, a handsome, six-footer, as the driver of the car which picked up Asinari and him on Massachusetts avenue, Back Bay, a short distance from the Harvard Bridge at 2:30 a.m. on March 22.

He said Blodgett stabbed him eight times during the robbery in the car on Back street, which runs parallel to Storrow Drive. Moses said Asinari was stabbed by Robert M. Shaughnessey, 22, of West Third street, South Boston, the passenger in the front seat of the car.

Moses, in a direct, deliberate manner, said Shaughnessey shot the MIT classmates at point-blank range. Moses played dead, he said, while Shaughnessey continued an unrelenting knife attack on Asinari.

Moses testified that he escaped when what Gaffney called the "death car" stopped on East Second street, South Boston, an hour later. However, Asinari was stalked by one of the four men in the car and was beaten to death as he lay in a gutter suffering "from more than 50 wounds."

Shaughnessey, arrested March 24 for the slaying hanged himself in Charles Street Jail on Nov. 11, 1975. Two men in the rear of the car with Asinari and Moses were never identified.

Blodgett was apprehended on March 7, 1977, in Houston, Tex., where he was working for a moving and storage company under an assumed name, "Carl William Hoffman."

As for Moses's identification of Blodgett as the driver of the car, Gaffney remarked: "Maybe he can't give a description to the nth degree but the face of the person two feet away from him was imprinted indelibly on his mind."

The prosecutor, recalling the point in the trial when Moses displayed the scars on his arms from the attack, said "he'll carry those wounds and scars on his body for the rest of his life as he'll carry the face of Blodgett in his mind."

Gaffney characterized Blodgett as a "schemer," a person who has no respect for anybody, and as the "moving force" in the events leading to Asinari's death.

"Most of the responsibility belongs to Blodgett. Why? If he didn't drive on down to Back street and didn't pull a knife, no murder and robbery would have taken place that night," Gaffney said.

The prosecutor reminded the jury that the government's case rested on a "joint venture" theory which, according to state law, the acts of one participant are attributable to all the participants of a common scheme.

Blodgett, in testimony in his own defense, admitted that on March 17 he stole the car used in the murder from a parking lot across from the Charles Street Jail.

However, he contended that the car was stolen from him shortly before 1 a.m. March 22, while he was drinking in "Barney Grogan's" at B street and Broadway, in South Boston.

Balliro argued that Moses "is grossly mistaken" in his identification with regard to the length of Blodgett's hair at the time of the crime and failed to notice a missing tooth in Blodgett's mouth.

The defense counsel also alleged that the method by which police displayed a series of "mug shots" to Moses while he was recuperating in Peter Bent Brigham Hospital was "suggestive."

The most difficult task confronting Balliro was dealing with Blodgett's flight from the jurisdiction a few days after the Asinari slaying.

"He told you he ran away because of fear," Balliro said. "Here's a young man who's been in trouble all his life."

Blodgett had testified that several house after the murder, he received an "anonymous telephone call" from a person who told him his car was used in the murder.

Balliro said Blodgett also realized that his keys were in the car and that they would be traced to his apartment. "He knew something terrible happened."

Gaffney countered that Blodgett's flight constituted "consciousness of guilt."

"The most terrible thing was that he left his keys in the ignition" and "because of that he knew he would get caught," Gaffney said.

Blodgett, in his testimony, never explained how he knew his keys were in the car when it was found, with its interior set afire, on Dorchester avenue, South Boston, a few hours after the murder.

He merely testified that when he left Grogan's his car was missing from where he parked it, and that when he searched his pockets he determined that his keys were missing.

Gaffney argued that all three of the necessary elements to prove first-degree murder were present in the case — deliberate, premeditated malice aforethought, "extreme atrocity or cruelty," and a killing in the commission of a felony punishable by life in prison, such as armed robbery.

The prosecution must prove that one of these three elements was present when the slaying occurred.

To show intent, Gaffney asked the jury to recall the statement made to Asinari and Moses. "You'll never leave this car alive."

"They were the prisoners of these two mad dogs in the front seat with knives, stabbing, stabbing, stabbing ..." Gaffney asserted.

The jury will begin its deliberations after receiving instructions this afternoon from Judge McGuire.

SUPPLEMENTAL APPENDIX "A"

complete testimony Detective Russell Childers 33 pages

(only transcript numbeirng)

1-20

THE DEFENDANT:  No, your Honor.

THE COURT:  Very well.  The presence of the view waived in open court.

Are there any other matters?

MR. BALLIRO:  There is a Motion for Disclosure of Identification Procedure, if your Honor pleases, has to be heard.  I ask to be heard with respect to that.

THE COURT:  We will hear that now.

MR. BALLIRO:  May the officer be called to the witness stand, your Honor, that conducted the photographic identification of the witness Robert Moses.  I believe that was Officer Childers.

THE COURT:  Very well.

MR. BALLIRO:  Sergeant Childers.

RUSSELL CHILDERS, Sworn

Direct Examination

Q    (By Mr. Balliro)  Will you identify yourself for the Court?

A    My name is Russell Childers.

Q    And what is your occupation?

A    I am a police sergeant attached to the Boston Police Department, presently at District 13, Jamaica Plain.

Q    And were you involved in an investigation of the circumstance that led to the charges of murder of one Asinari?

A    Yes, sir, I was.

Q    Pursuant to your activities in connection with this investigation, did you conduct a showing of pictures to one Robert Moses, a witness in this case?

A    Yes, sir.  I did.

Q    And on how many occasions did you submit pictures to Mr. Moses for viewing?

A    I must say perhaps twice.

Q    And are you aware of instances where other law enforcement officers displayed pictures to Mr. Moses?

A    Yes, sir.  I am.

MR. GAFFNEY:  Objection.  Objection.

THE COURT:  He may answer that Yes or No.

Q    And would you tell us the circumstances in those instances that you are aware of?

MR. GAFFNEY:  Objection.

THE COURT:  I will sustain that.

Q    Do you know the names of other officers who showed pictures to Mr. Moses in connection with the investigation of this case?

A    Yes, sir.

Q    And what are their names?

A    Detective Thomas Maguire, who is presently retired; Detective Fred Spiranso.

MR. GAFFNEY:  Who?

1-22

THE WITNESS:  Fred Spiranso, presently at District 1.  Detective James Cotter.  He is presently retired I believe Detective Paul Cahill, District 6, and Detective William Eunson, who is presently retired.

THE COURT:  How do you spell his name?

THE WITNESS:  E-u-n-s-o-n.

Q   Were you present, Sergeant Childers, at any of the showings of pictures to Mr. Moses that were conducted by these other officers?

A   I believe at one time, yes.

Q   And by which officer?

A   Detective Maguire.

Q   Was an identification made as the result or results of the showing of the pictures by the other four officers to Mr. Moses?

MR. GAFFNEY:  Objection.

THE COURT:  I don't understand the question.

MR. BALLIRO:  Was he made aware of whether or not - I will reframe the question.

THE COURT:  Thank you.

Q   Were you informed by any of the other four officers, Officer Spiranso, Officer Cotter, Officer Cahill, or Eunson as to whether or not Mr. Moses selected any pictures of a suspect or suspects in the course of those viewings?

1-23

MR. GAFFNEY:  Objection.

THE COURT:  He may answer it Yes or No.

THE WITNESS:  Yes.

Q    And did they tell you that he had selected the picture of a suspect or suspects?

MR. GAFFNEY:  Objection.

THE COURT:  Sustained.

MR. BALLIRO:  My exception.

Exception No. 1-3.

Q    Now, when did you conduct your two showings of pictures to Mr. Moses?

A    I believe the first time was the 23d of March, 1975.

Q    And was Mr. Moses in the hospital at that time?

A    Yes, sir.  He was.

Q    And in relation to the commission of the offense, approximately how long was it after the offense had allegedly taken place?

A    The next day.

Q    And can you within reasonable limits describe it in terms of hours, approximately how many hours?

A    It would be 24 to 28 hours, perhaps.

Q    And were there other officers in your presence at that time?

A    Yes, sir.

Q    And who was present with you?

1-24

A    Detective Cotter.  I believe Detective Walter Derby, and Detective Thomas Maguire.

Q    And were there personnel of the hospital in attendance at that time?

A    Medical personnel?

Q    Yes.

A    Yes.  They were in and about the room.

Q    Did they in any way participate in the process of displaying pictures to Mr. Moses?

A    Not that I know of.

Q    What hospital was it?

A    Peter Bent Brigham.

Q    Who was it of the officers who you named that was in charge so to speak of showing the pictures to Mr. Moses?

A    At that time, I suppose I would have been.

Q    And how many -- strike that.

How long did this process take, approximately, of showing pictures to Mr. Moses?

A    Half an hour; three-quarters of an hour.

Q    And approximately how many pictures were shown to him during that period of time?

A    Well, in the book we had, there was approximately 200 photos.

Q    And would you explain, please, to us the method by which the showing -- the process by which the showing took place?

1-25

How did you do it?

A    The book was opened.  The victim himself was not able to turn the pages.  The pages were being turned for him by officers.

Q    Who was it that was responsible for selecting this particular book?

A    It was the only book we had at the time.

Q    Well ---

A    I would say I would be.

Q    All right.  And from what place did you obtain that book?

A    In District 6 in South Boston.

Q    And was that the only book that contained pictures -- well, strike that.

Whose pictures did this con -- whose pictures did this book consist of?

A    Various individuals that had been arrested in the South Boston area.

Q    And does the book have a name?

A    No.

Q    Does it have any legend at all on it by which we can describe it for the purpose of the record?  What would you call it?

A    No.  It was a regular black photographic book.

Q    Of approximately what dimensions, two feet ---

1-26

A    It is probably a foot and a half by a foot and a half.

Q    All right.  And were all 200 pictures shown to Mr. Moses at that time?

A    I don't think they -- at that particular time, they were not.

Q    Well, what -- how many pictures approximately were shown to him during this approximate half-hour period of time?

A    I couldn't say.  At that time, the victim wasn't that responsive.

Q    Was he under medication?

A    Yes, he was.  He was quite sick.

Q    Was he able to carry on a conversation with you?

A    Not too well.

Q    Did he understand that he was being shown pictures?

A    Vaguely I would say yes.

Q    And did he make an effort and attempt to look at some of the pictures at least?

A    He viewed some photos, yes.

Q    And in terms of percentages, how many of the pictures do you think he looked at?

A    Maybe eight or ten pages.

Q    All right.  And in that eight or ten pages were about how many pictures?

A    Perhaps eight to a page.

Q    Okay.  He looked at maybe 60?

1-27

A    60 or 70

Q    60 or 70 on eight pages.  Did he select any pictures from the pictures he looked at?

A    No.

Q    Now, did you know at that time whether or not there was a picture of the defendant, Mr. Blodgett, in that book?

A    At that time, no, I did not.

Q    You did not know if there was one in there?

A    No, sir.  I did not.

Q    Did you determine later on whether or not in that book of approximately 200 pictures there was a picture of Mr. Blodgett?

A    I learned later on that there was not.

Q    There was not.

With respect to a co-defendant whose name you know is Mr. Shaughnessy in this case?

A    Right.

Q    Was there a picture of Mr. Shaughnessy in that book?

A    There was.

Q    And was there a showing of that picture to Mr. Moses?

A    At a later date, yes.

Q    How about that day at the showing of the pictures?

A    I don't recall if he saw that picture that day at all.

Q    But at any rate he didn't select anyone's picture?

1-28

A    No.

Q    When was the next time you participated in a showing of pictures to Mr. Moses?

A    On March 27th.

Q    That is some four days later?

A    Yes, sir.

Q    And where did that showing take place?

A    At the Peter Bent Brigham Hospital.

Q    And had the condition of Mr. Moses improved appreciably during that four-day period of time?

A    Yes.  He was quite more alert.

Q    Rather clear thinking would you describe him at that time?

A    Yes, he was.

Q    Not under the visual effects, at least, of medication?

A    Not that I could see, no.

Q    Who participated in this second showing?

A    Myself and Detective Maguire.

Q    And approximately how long did it take?

A    Half an hour, three-quarters of an hour.

Q    And about how many pictures were shown to him?

A    I believe 13.

Q    And who was it that had selected those 13 pictures?

A    Detective Maguire.

Q    And were all 13 pictures shown to Mr. Moses?

A    Yes, they were.

Q    And did he select any picture from those 13 pictures?

A    Yes, he did.

Q    And how many pictures did he select?

A    He selected one.

Q    And who was that person?

A    The defendant, John Blodgett.

Q    And do you have those 13 pictures with you?

A    Yes, sir, I have.

Q    May I see them, please?

(Mr. Gaffney passed photographs to Mr. Balliro.)

Q    I show you a group of pictures that have just been handed to me by Mr. Gaffney, 13 in number, and would you just look at them briefly, please, or would you look at them as long as it is necessary to determine whether they are the pictures that were shown to Mr. Moses?

A    These appear to be the same pictures that were shown to Mr. Moses that day.

Q    Now, do you remember in what order these pictures were shown to Mr. Moses?

A    They weren't shown in any order. They were all placed on the bed.

Q    All right. And when he -- would you pick from this the picture of Mr. Blodgett that you say he selected at that --

1-30

he selected at that time?

A   The top photo here.

MR. BALLIRO:  I am going to ask, if your Honor pleases, that all 13 of these pictures be marked for identification, and I would ask that for the purpose of understanding the record a little more clearly, that they be grouped 12 in number, and the picture that has been testified to as selected be marked separately.

THE COURT:  In my right hand, is that the picture that was selected?

THE WITNESS:  That's correct.

THE COURT:  That one may be marked A for Identification.

THE CLERK:  May it be placed in an envelope for purposes of marking it, your Honor?

THE COURT:  Okay.

(The aforementioned single photograph was placed in an envelope and marked A for Identification.)

THE CLERK:  And the remaining 12 will be marked B for Identification, your Honor.

THE COURT:  B for Identification, consisting of 12 photographs.

(The aforementioned 12 photographs were placed in an envelope and marked B for Identification.)

1-31

MR. BALLIRO:  Thank you, sir.

Q   Now, Sergeant Childers, with respect to the showing of the pictures generally to Mr. Moses, did either one of the officers, yourself or ---

THE CLERK:  Excuse me, sir, just for one moment? Your Honor, may we let the jurors go?

THE COURT:  Yes, you may.  2:00 o'clock for the jurors.

Q   --- or Officer Maguire say anything to Mr. Moses relative to the showing of pictures to him?  In other words, I am not interested in whatever small talk might have taken place, but what do you recall as having been said to Mr. Moses with respect to the viewing of pictures?

A   I can't remember word for word, but we went into the room. We told him that we had some photographs that we would like him to look at.

Q   Did you indicate to him that the 13 men that you were submitting pictures of to him were all suspects in the case?

A   No, we did not.

Q   Did you indicate to him that any of them were suspects in the case?

A   No, sir.  We did not.

Q   Now, when was it that you first saw the 13 pictures that were submitted to Mr. Moses?

A    When they were put together in District 6.

Q    And you have testified that you had no part in the selection of the 13 pictures?

A    I was with Detective Maguire when he picked up the other photos.

Q    I see.  In other words, he first picked up a photo of Mr. Blodgett?

A    Yes, sir.  It was his own photo.

Q    I see.  So that Officer Maguire had a picture of Mr. Blodgett first?

A    He did.

Q    First?

A    He did.

Q    Then if I understand you correctly, he got some pictures to mix that picture up with pictures of other people?

A    Yes, sir.

Q    And that is how you got the other 12 pictures?

A    Yes, sir.

Q    All right.  Now, did you do anything to insure as far as you were concerned that the viewing of these pictures; that is to say, Mr. Blodgett's picture in relation to the others, would be a fair and impartial viewing?

        MR. GAFFNEY:  I object to the question.

        THE COURT:  Let me have that question read back.

1-33

(The last question was read.)

MR. GAFFNEY:  Objection.

THE COURT:  What is your objection?

MR. GAFFNEY:  My objection is that this calls for a conclusion, your Honor.  The witness has already stated what he did and the Court can rule on the facts and not on a conclusion by the officer if he is permitted so to do it.

THE COURT:  I will let him describe what he did, if indeed he did, in addition to laying the pictures on the bed.

THE WITNESS:  I directed Detective Maguire to put a group of pictures together of all white males in approximately the same age group.

Q  Well, now, would you look at Defendant's Exhibit A for Identification, please.  Is that a picture of Mr. Blodgett?

A  Yes, it is.

Q  And that shows a man with light blond hair, isn't that correct?

A  That's right.

Q  All right.  Had you received a description or been furnished with a description by Mr. Moses of the man who he claimed was the driver of the automobile that evening?

A  Yes, sir.

Q  And what was the description that Mr. Moses furnished to you?

A    Probably six foot in height, broad shoulders, not really long hair but medium length dirty blond hair.

Q    All right. And would you now look at the other 12 pictures once again briefly that are marked Exhibit B for Identification. You have looked at them?

A    Yes, sir.

Q    And they are all of men with black hair, isn't that correct?

A    No. I wouldn't say it is correct.

Q    Well, would you pick out from that group of 12 those that you feel portray men with dirty blond hair?

A    Well, it is very difficult with photographs, sir, to tell colors in black and white.

Q    Well, I know that it is, but those are photographs that you showed to the witness?

A    That's right. I know -- here is a photograph of a man I know here that has the same color hair and that shows him to have black -- almost black hair.

Q    Well, you know that that man in that picture has lighter hair but the picture shows dark hair, isn't that correct?

        MR. GAFFNEY: Objection. Objection, your Honor.

        THE COURT: I will allow it.

Q    Isn't that correct?

A    Yes. It shows it a little dark, yes.

Q    And Mr. Morse didn't know that man, did he?

A  Mr. Morse, sir?

Q  Not Mr. Morse, Mr. Moses. I'm sorry.

A  Mr. Moses didn't know him?

Q  I mean, as far as you know, you didn't show him pictures of anybody that he knew?

A  As far as I know, I didn't.

Q  So, for the purpose of fairness in the identification procedure, even though you knew the man that is in the picture that I am now holding in my hand -- by the way, do you know the name of that man?

A  Yes, I do.

Q  What is his name?

A  Carscus.

Q  I'm sorry?

A  Carscus.

MR. BALLIRO: Can we just mark on the back of this so ---

THE COURT: Any objection?

MR. GAFFNEY: Yes. I object to that, your Honor.

MR. BALLIRO: I just want it to be identified for the record, your Honor.

THE COURT: Put a mark -- that is A for Identification? Put a mark -- would you put a "1" on the back of that?

THE CLERK: Just a "1", your Honor?

1-36

THE COURT:  Yes.

Q    All right.  Now, of this group of 12, would you pick out from that group any one of those 12 pictures that you feel shows a man with blond hair?

A    Here is another picture here of a boy.  I know his hair is light reddish.

Q    But here it is as black as the ace of spades, isn't it, in the picture?

A    Like I said, in some photographs sometimes you are deceived.

Q    Wait a minute.  Wait a minute.  Sometimes you are deceived?

THE COURT:  Wait a minute.  Now, one at a time.

Q    Now, again, Sergeant Childers ---

MR. GAFFNEY:  Wait a minute.  I object to Mr. Balliro arguing with and badgering this witness, your Honor.

Q    Well, do you feel that you are being badgered, Sergeant Childers?

A    No, I don't.

THE COURT:  Just a moment.  Strike that.  Let's start again.

Q    The picture that you have just handed to me is a picture of a man that you know to have reddish kind of hair?

A    Yes.

Q    This picture is not in color, is it?

A    No, it is not in color.

1-37

Q   It is in black and white.

A   That's right.

Q   And is it fair to say that his hair looks black in the picture?

A   It appears to be.

Q   Now, Sergeant, directing your attention once again to A for Identification, the picture of Blodgett.  That shows a man who obviously has light hair, isn't that correct?

A   No.

Q   Isn't it true that it is due to the exposure of the film?

A   Not all the time, no.

Q   I know that it is not true all the time as in that picture that was shown to Mr. Moses, isn't that correct?

A   No, it isn't.

Q   Isn't it fair to say that although there may be others in this group who in fact have light hair that as far as the 13 pictures are concerned, the only picture that shows a man with light hair is the picture of John Blodgett?

A   That is not true.

Q   Well, pick out another one that shows a man that has light hair.

A   (Passing a photograph to Mr. Balliro.)

Q   You say the man in the picture you just handed me has light hair?

1-38

A    That's right.

Q    Well, that hair is black, is it not, in the picture?

A    No.

Q    You say ---

A    I wouldn't say so. I would say it is about the same. The side view there shows black hair.

          MR. BALLIRO: I would ask your Honor to make a view of it.

          THE COURT: Show it to counsel.

          MR. BALLIRO: Your Honor pleases, I will hand you first A for Identification, which is the picture of John Blodgett, and I hand you now the picture that the officer says that from the group of 12 shows a man with hair approximating the color of Mr. Blodgett's hair.

          THE WITNESS: There is another photo ---

          THE COURT: Wait a minute. Wait a minute. There is no question before you.

Q    Have you selected another picture from the 12?

A    Yes, sir. There is one. The photo on the left there shows dark hair. On the right it shows light hair.

Q    You say that the picture on the right shows a man with light hair?

A    Yes, sir.

          MR. BALLIRO: Again, if your Honor pleases, would

1-39

your Honor please view that?

(Mr. Balliro passed a photograph to the Court.)

THE WITNESS:  The man appears to be dark.

THE COURT:  Wait.  Wait.

Q  Well, you say that this picture shows a man that has light hair?

A  He had reddish blondish hair.

Q  Can you see reddish blondish hair in that picture?

A  No, but I don't see black, neither.

Q  Well, you don't see blond, do you?

A  No.

Q  You don't see light hair, do you?

A  According to what is on the left, it is lighter than on the right side.  The left side is lighter than the right side.

Q  I understand that it is lighter on one side than on the other, but in neither instance is it as light as the hair in the picture of Blodgett, is it?

A  I think it is as light as the one on the right-hand side.

Q  You really feel that way, Sergeant?

A  Yes, sir.  That is a very light exposure on the photograph. That is why it appears to be light.

MR. BALLIRO:  Would your Honor like to view it as compared ---

THE COURT:  No.  I have seen it.

MR. BALLIRO:  Okay.

Q   Now, have you now picked from the group of 12 all of those that you say whose hair approximates that color?

A   I am not an expert on photography, Mr. Balliro.  These all might be light hair for all I know.

Q   That is not my question.  My question is with respect to the photos as they appear are not as the people really are?

A   Any one of these could be light hair as far as I know.

Q   All right.

A   I don't know most of them.

Q   Now, Sergeant Childers, you say that -- in the description that was furnished to you by Mr. Moses, what age did he approximate the driver of the car to be?

A   22, 21 -- 21, 22.  In that vicinity.

Q   All right.  Do you know the names of the men who are portrayed in the 12 pictures that have been marked B for Identification?

A   No.  Very few of them I know.

Q   All right.  How many of them do you know?  Would you go through them?

A   Perhaps those three here (indicating).

Q   All right.  And would you give us the ages -- the age as you understand it to be of the picture that has been marked A-1 for Identification?

A    I would say in the same age group, 21, 22, 23.

Q    And this second picture that you selected from the 12?

A    This fellow would be in about the same age group, 20, 21.

Q    And the third picture?

A    This fellow is a little bit older -- 24 or 25.

Q    Is that all that you would say that man is?

A    Yes.

Q    Do you know him?

A    I knew him.

Q    What was his name?

A    Flannagan.

Q    What is his first name?

A    I don't know his first name.  He is deceased now.  I think it is Robert.

Q    You wouldn't say that that man is closer to 40 years old than 23, 24?

A    No.  I wouldn't say that.

Q    Do you think his name is Robert Flannagan?

A    Yes.

Q    How long has he been dead, if you know?

A    Two or three years.

Q    I see.  How old would you say this man is?

A    That is tough to tell with the beard  24, 25.

Q    All right.  And he has a beard?

1-42

A    Yes, sir.

Q    Now, Mr. Moses had not described a man to you that had a beard, is that correct?

A    No. That's right.

Q    And did you really think when you were participating in selecting pictures that were going to be shown to Mr. Moses that it would help him make a fair identification if you showed him a picture of a man with a beard? Do you think that was going to help him make a fair identification?

A    Well, we weren't sure what -- we were testing his observation, too, of photographs.

Q    But were you testing his ability to select a picture of either the man that he said was the driver of the car or the man that he said was a passenger in the car, isn't that correct?

A    That's right.

Q    And he had described a man that had medium -- as I understand you, medium dirty blond hair?

A    Right.

Q    Nothing about a beard, isn't that correct?

A    Pardon me?

Q    Nothing about a man with a black beard, isn't that right?

A    No. That still could not be black, too. I don't know if it is black or not.

1-43

Q   Well, I know, but the picture ---

A   The picture displays dark.

Q   Yes, a dark beard?

A   Yes, sir.

Q   Okay. And he hadn't said anything about a man with a dark beard, is that right?

A   That's right.

Q   Now, here is a picture that has on the back the legend: "Las Name: McDonald." I show you this picture. How would you describe his hair in this picture?

A   Blond, curly.

Q   Blond?

A   Long blond and curly.

Q   Would bushy be ---

A   Bushy.

Q   Would very bushy be a fair description?

A   Yes.

Q   All right. And Mr. Moses had not described anyone who had blond very bush hair, had he?

A   No.

Q   And isn't it fair ---

A   Not that I know of, although I am not sure. There was two other people that we were looking for that were in the back seat of the car.

1-44

Q.   Well -- but you had first selected a picture of Mr. Blodgett, isn't that right?  In other words, is it fair ---

THE COURT:  May I interrupt you?

MR. BALLIRO:  Surely.

THE COURT:  It is five minutes past 1:00.  How much longer are you going to be?

MR. BALLIRO:  Unfortunately, I think we have another 30 minutes or so, your Honor.

THE COURT:  2:00 o'clock.

(Whereupon, at 1:05 p.m., the hearing was adjourned, to resume at 2:00 o'clock.)

- - - - -

1-45

## AFTERNOON SESSION

(The Court came in at 2:10 p.m.)

THE COURT: Sergeant, you continue to testify under oath.

THE WITNESS: Yes, sir.

THE CLERK: I'm sorry, your Honor. May the record indicate that the defendant Blodgett is present together with his attorney, Mr. Balliro, and Mr. Gaffney is present for the Commonwealth.

The witness was placed under oath and has testified before the noon recess.

MR. BALLIRO: May I proceed, your Honor?

THE COURT: You may.

MR. BALLIRO: Your Honor, in the interest hopefully of saving time, it has occurred to me during the course of the recess that of necessity I have had to refer with respect to Exhibit B for Identification, that consists of 12 photographs, and as this picture, when I have been directing the witness' attention to one of the photographs, I would ask whether or not with respect to B for Identification the 12 photos can be numbered from 1 to 12.

THE COURT: I see no objection. We have numbered the first one.

THE CLERK: May that be done, your Honor?

1-46

THE COURT: Yes, 2, 3, 4, 5, and so forth.

THE CLERK: Your Honor, originally when the Court ordered the number, he ordered it be marked A-1. May it be changed to B-1?

THE COURT: Yes.

THE CLERK: That has been changed to B-1.

(The 12 photographs were so marked B-1 through and including B-12.)

THE CLERK: Thank you, your Honor.

MR. BALLIRO: Thank you.

Q  Now, first of all, Sergeant, directing your attention to all 12 of the pictures that have been marked as Exhibit B for Identification, did Mr. Moses indicate at any time during the course of your showing him these pictures that any of them other than the picture of Blodgett that he selected looked like Mr. Blodgett?

A  No, not that I recall.

Q  So that did he -- strike that out.

Did he say to you that the only picture that looked like the man that he says was the driver of the motor vehicle was the picture of Mr. Blodgett that he selected?

A  Yes, sir.

Q  All right. Now, directing your attention to B-1 for Identi-

fication. Now, did that picture when you and Sergeant Maguire decided to include it along with the picture of Mr. Blodgett, did that picture in any way fit the identification that had been furnished to you by Mr. Moses?

MR. GAFFNEY: Objection.

THE COURT: Let me see it.

(Mr. Balliro passed a photograph to the Court.)

THE COURT: Thank you.

In that form, sustained.

Q Did either you or Detective Maguire, Sergeant Childers, seek to select pictures that were going to be shown to Mr. Moses along with the picture of Mr. Blodgett of men whose photographs appeared similar to the photograph of Mr. Blodgett?

A No.

MR. BALLIRO: That is all.

THE COURT: Any cross?

Cross-Examination

Q (By Mr. Gaffney) Will you tell us what the basis of the selection of those photographs shown in Exhibit B for Identification was?

A When the series of photographs were selected, they were based on approximate age and white males and in the South Boston area.

1-48

Q    In other words, you selected 13 photographs that were white males in the same general age group?

A    Yes, sir.

Q    And from the South Boston area?

A    Yes, sir.

Q    Was there any other basis for the selection of these 13 photographs?

A    No, sir.

Q    Like features or anything else like that?

A    No.

Q    And at that time you had no knowledge whether or not Mr. Moses would select any of these pictures, is that correct?

A    That's correct.

Q    And when Moses selected -- strike that out.
     When Moses was shown the pictures, the whole 13 were placed on the bed, is that correct?

A    That's correct, sir.

Q    And what was Mr. Moses' position, was he in the bed or in a wheelchair?

A    He was in a wheelchair with both arms in a cast in an upright position.

Q    So that he was not able to handle the pictures himself?

A    Not a bit, no.

Q    And how did he indicate to you or the other officer which

1-49

one of the 13 photos he was selecting from the 13 as being the driver of the car that he was in on the night of March 22d, 1975?

A   He selected orally through which row it was in and which number it was down.

Q   Now, you have been on the police force how long, sergeant?

A   27 years.

Q   And all of the photographs that are received by the police department and pictures that you have seen over the 27 years of the type that were shown to the victim in this case, Mr. Moses, were they all black and white photos?

A   Yes, sir.

Q   And do any of them in any way depict the color of the hair?

A   It is very difficult to pick out.

Q   So they don't have the color of the hair in these photographs?

A   No, they don't.

Q   They are all black and white photos?

A   That's right.

Q   You have seen pictures of individuals that you knew personally whose photographs were taken, and the hair, although you knew the person to have blond hair, it would show up dark on the photograph, is that correct?

MR. BALLIRO:   I object, your Honor.

1-50

THE COURT:  I think it is already in evidence.

Q  Was this the only time on March 27th that Mr. Blodgett -- strike that out -- that Mr. Moses selected the photograph of Mr. Blodgett?

A  As far as I know, yes.

Q  Well, to your knowledge, this was the only time that Blodgett's picture was in any group?

A  Yes, sir.

Q  And from the time of the incident on March 22d through the 27th, the day that he picked out the photograph of Blodgett, Mr. Moses was in the hospital?

A  Yes, sir, he was.

MR. GAFFNEY:  I have nothing further, your Honor.

MR. BALLIRO:  If I may, your Honor?

THE COURT:  Yes.

Redirect Examination

Q  (By Mr. Balliro)  So that, Sergeant Childers, as far as you know, this is the only photograph that has been selected by Mr. Moses of Mr. Blodgett?

A  As far as I know, sir, yes.

Q  And do you have any knowledge of Mr. Moses having made any other identification of Mr. Blodgett other than the selection of this picture?

A  Not that I know of, sir.

1-51

MR. BALLIRO: That is all.

THE COURT: You are excused. Thank you.

(Witness steps down.)

MR. BALLIRO: That completes my presentation of evidence on this motion, if your Honor pleases.

THE COURT: Do you wish to be heard on it?

MR. BALLIRO: No, I don't, if your Honor pleases.

THE COURT: Do you wish to be heard on it, Mr. Gaffney?

MR. GAFFNEY: No, I don't, your Honor.

MR. BALLIRO: May Exhibits A and B for Identification be marked as exhibits for the purpose of hearing on my motion for disclosure of identification procedure, your Honor?

THE COURT: Let me see the motion. Now, A and B were limited in this time for a hearing on the motion for disclosure of identification procedure.

THE CLERK: Yes, your Honor.

THE COURT: So it is limited to that extent.

MR. BALLIRO: Thank you, your Honor.

THE CLERK: It will remain A and B, your Honor?

THE COURT: Yes, but make a note on them that they are limited.

THE CLERK: I will file them as having been entered

on the defendant's motion for disclosure of identification procedure.

MR. BALLIRO: I believe that completes all of the pretrial motions, your Honor.

THE COURT: Thank you.

THE CLERK: Your Honor, for the record, the defendant has a motion to suppress statement, which was filed ---

MR. BALLIRO: As I indicated to the Court this morning, your Honor ---

THE COURT: That is withdrawn, not having been filed.

THE CLERK: In addition to which, your Honor, I have another motion which has already been discussed by the Commonwealth. The Commonwealth doesn't wish to proceed.

MR. BALLIRO: Before we leave this motion to suppress statement, your Honor, the record should reflect that I am withdrawing it because I am informed by the defendant that he was informed of his rights.

THE COURT: Thank you.

MR. GAFFNEY: The Commonwealth withdraws the other motion re: physical appearance because the question is now moot, your Honor.

SUPPLEMENTAL APPENDIX "B"

complete testimony of Robert D. Moses    107 pages

(only transcript numbering)

4-43

Honor please.

THE COURT:  Come up.

MR. GAFFNEY:  I'm sorry, your Honor?

THE COURT:  Counsel.

(Bench conference not recorded.)

ROBERT D. MOSES, Sworn

Direct Examination

Q    (By Mr. Gaffney)  Will you state your full name, please?

A    Robert David Moses.

Q    And where do you live?

A    771 American Legion Highway, Roslindale.

Q    What is your occupation?

A    I am a student.

Q    Where?

A    At Hopkins Medical School.

Q    What year are you in?

A    Second year, the end of my second year.

Q    Going into your third year?

A    Yes.

Q    Now, in 1975, Mr. Moses, were you a student at Massachusetts Institute of Technology?

A    Yes.

Q    In Cambridge?

A    Yes.

4-44

Q    And what year were you in in 1975?

A    I was in my third year, the last year, actually.

Q    And how old are you now?

A    22.

Q    Now, did you know another student at M.I.T. named John Asinari?

A    Yes.

Q    And was he -- what program were you taking at M.I.T.?

A    In biology.

Q    Was John Asinari taking the same program?

A    Yes.

Q    What year was he in?

A    He was in his third year.

Q    And how old was he in 1975?

A    I believe he was 20.

Q    How long had you known him in 1975?

A    Going into the third year.

Q    So from the first year to the third, you and he had been friends?

A    Yes.

Q    And do you know whether or not he was going to medical school or intending to go to medical school?

A    Yes.

Q    Now, directing your attention to March 21st, 1975, Friday.

4-45

did you and John Asinari have an occasion to leave the dormitories at M.I.T. to go someplace?

A    Yes.

Q    And about what time of the evening or on March 21st, 1975, did you leave the dormitories?

A    About 9:30.

Q    Where were you going?

A    To Father's Fore.

Q    Did you have some arrangements to meet somebody?

A    We were going with two girls.

Q    And how did you -- Father's Fore is located where?

A    It is on Massachusetts Avenue in Cambridge.

Q    And how did you get from the dormitories at M.I.T. in Cambridge to the Father's Fore in Cambridge?

A    We walked.

Q    Were the two girls with you at that time?

A    Yes.

Q    Would you tell us how long you remained at Father's Fore that evening of March 21st, 1975?

A    About an hour and a half.

Q    Then where did you go after that?

A    The girls were going back to B.U. and we walked over to 77 Massachusetts Avenue and the girls got in a cab there to go back to B.U., and we walked towards Boston over the

4-46

Massachusetts Avenue bridge.

Q When you got over the bridge, where did you go?

A Well, no. We were walking towards Boston, but we actually got a ride over the bridge.

Q Where did you go then?

A To Father's Five. That is a club on Massachusetts Avenue in Boston.

Q What is the name of the place?

A Father's Five.

Q And about what time of the evening on March 21st, 1975, did you arrive at Father's Five?

A About 11:30.

Q What did you do there at Father's Five?

A We each had one drink and stayed there about -- it would be about a half hour after that.

Q What kind of drinks were you drinking there?

A Beer.

Q Where did you go after you left the Father's Five?

A We walked to Kenmore Square heading towards the club that was closed and we met two boys who told us that they would bring us to King's Row, which is another club. We went to King's Row.

Q Where is that located?

A That is just down the street from Kenmore Square.

4-47

Q   About what time of the evening on March 21st, 1975, did you arrive at King's Row?

A   About 12:00 or 12:30.

Q   12:00 or 12:30?

A   Yes.

Q   What did you do there at King's Row?

A   Well, we stayed there, listened to the music for about -- until about 2:00 o'clock, 1:30, or 2:00.

Q   Did you have anything to drink there?

A   No, I didn't.

Q   What about John Asinari?

A   I wasn't with him.  He was sitting in the back and I was up the front.  I know that he had at least one beer, but as I said in the other testimony that we were ---

THE COURT:  Wait; wait; wait.

Q   How tall was John Asinari?

A   About Six-four.

Q   Do you know approximately how much he weighed?

A   About 200.

Q   How tall are you?

A   Five-eight.

Q   And you weigh about how much?

A   155.

Q   Now, after you left King's Row, where did you go?

4-48

A    We walked to Kenmore Square.  There is a pizza place on the corner and we went into the pizza place and we split a pizza.

Q    How much money did you have on you when you left the dormitory at M.I.T.?

A    About $10.

Q    And did you have a wallet, also?

A    Yes.

Q    Did you have some keys?

A    Yes.

Q    And do you know approximately how much money John Asinari had on him?

A    About $10.

Q    Do you know whether or not he had a wallet?

A    (Pause.)  No, I don't.

Q    Now, about what time did you leave the pizza place at Kenmore Square on March 21st?

        THE COURT:  I will see counsel.

        (Bench conference recorded as follows:)

        THE COURT:  The indictment shows a different date.  Ask about the correct date so there is no problem.

        Okay.

        (End of bench conference.)

Q    About what time in the morning was it when you left on

4-49

March 22d the pizza place?

A    About 2:00 or 2:30.

Q    Where did you go from there?

A    We walked towards the Massachusetts Avenue bridge again.

Q    That is, from Kenmore Square towards the Massachusetts Avenue bridge?

A    Yes.

Q    Where were you intending to go?

A    Back to the dormitory.

Q    That would be across the bridge into Cambridge?

A    Yes.

Q    And as you walked towards the Massachusetts Avenue bridge, you were on Massachusetts Avenue?

A    Yes.

Q    And did you do something, or did you and John do something to try and get transportation?

A    Yes.  We hitchhiked, and a car stopped for us.  After ---

Q    Then what happened?

A    --- after a few minutes, a car stopped for us and we got into the car.

Q    What kind of a car was it?

A    It was a two door.

Q    Do you recall the color?

A    Not really.

4-50

Q    Dark or light?

A    It was dark.

Q    You say it was a two-door car?

A    Yes.

Q    And you and John Asinari got in this car?

A    Yes.

Q    You both got into it in the same door?

A    Yes, the passenger door.

Q    All right. And where did you get into the car--what part of the car?

A    The back. I got in first and John come in behind me.

Q    In order to get in, did the seat have to be pushed and then ---

    MR. BALLIRO:  I am going to object.

    MR. GAFFNEY:  I will withdraw that.

Q    Will you tell us what occurred in sequence when they opened the door for you to get into the car?

A    First of all, the passenger in the front seat, he leaned forward and pulled the seat forward and I walked in to the back seat and sat down. Then John come in and sat down beside me.

Q    Was there anyone else in the back seat?

A    Yes. There were two boys in the back seat.

Q    Where were they seated in the back seat?

4-51

A    Well, they moved over to the left side so that I was the next one and then John was the last one on the right.

Q    So the two boys that were already in the car, they would be directly behind the operator, is that correct?

A    Yes.

Q    And where were you and John Asinari seated?

A    In the back right.

Q    Behind who?

A    The passenger.

Q    There were two people in the front seat?

A    Yes.

Q    And how far in feet or inches were you from the people in the front seat?

A    About two or three feet.

Q    Now, after you got into the -- about what time in the early morning of March 22d, 1975, was it that you got into this car?

A    About 3:00.

Q    Will you tell us whether or not there was any conversation with the people in the car either before the car took off or immediately as it took off?

A    There wasn't any once we were in the car. We just -- everything was quiet.

Q    Was there any indication or anything said as to where you

4-52

people were going?

A   Yes; just over the bridge.

Q   This was before you got into the car?

A   Yes.

Q   Now, after you got into the car, was the motor still running?

A   Yes.

Q   Would you tell us what happened then?

A   The car drove up and started going over the bridge. It took a right turn down Back Street and ---

Q   Back Street is located where?

A   Paralel  to Storrow Drive.

Q   And can you describe this street?

A   It is a narrow road behind the apartment houses.

Q   Then what happened?

A   Then it went about 20 yards down the road and they turned into a parking lot and parked the car there.

Q   Did they turn the motor off?

A   I don't remember.

Q   What were the lighting conditions there?

A   There was a street light above in front that come down on to the front of the car.

Q   You mean the light did or the ---

A   The light.

4-53

Q    So as far as your ability to view the persons in the front seat, what were the lighting conditions from this light?

A    They were good. I could see well.

Q    All right. When the car pulled into this parking spot, will you tell us what happened then?

A    Well, the first thing I heard was some giggling in the front. Then the two guys in the front turned around. They each had knives in their hands. The driver, he put his knife up to me, and the other boy, he put his knife up to John, and I was watching the knife against me, and the driver, he put it up and down, going up and down, like so (indicating).

Q    Up and down what?

A    Against my arms and chest. Then ---

Q    Did he say anything at that time?

A    He said, "Let's see what you have in your pockets." I reached into my front left pocket here to get my keys, and while I was going in, he slashed me on the hand (indicating).

Q    On your left hand?

A    Yeah. Then I pulled out the keys and handed them to him, and he took them and was dangling them in the front seat. He said, "Nice keys you have here." Then ---

4-54

Q    This is the operator you are talking about now?

A    Yes.

Q    When you got that slash on your left hand, can you tell us whether or not -- was there any bleeding from that cut?

A    Yes.  The hand was bleeding.

Q    Was it bleeding much or a little or what?

A    Yeah.  It was bleeding quite a bit.

Q    Then what happened?

A    Then I reached into the back left pocket to get my wallet out, but I knew I didn't have any money.  I gave him the wallet and he opened it up in the front seat, and I said, "Look.  I know I don't have any money, but take us back to the dormitory and I have $40 there.  I will give it to you."  And he said, "That is too bad you are not in the dormitory now."

     So John had given the other boy his wallet by this time, if he had a wallet, or his money.  I don't know what it was, and then they both turned around to us, you know, with their knives and started swearing and stabbing.

Q    What did they say to you?

A    "Mother fuckers.  Cock suckers," and things like this.  Then ---

Q    You said they started stabbing you?

4-55

A    Yes.

Q    What part of your body and who was doing it?

A    Well, the driver did it to me and the other guy did it to John.

Q    And how many times at that time were you stabbed by the driver, if you can recall?

A    Just some of them actually got through.

Q    Pardon?

A    Just some of them actually got through.

Q    What do you mean by that?

A    A lot of them just stayed in the jacket or he missed me, you know. Some of them got my left arm, one in my left leg.

Q    How many times did he attempt to stab you then?

A    About 15 times.

Q    Was he saying anything at that time, the driver?

A    Swearing.

Q    Swearing like you have already said?

A    Yes.

Q    Then what happened?

A    Then they turned around and backed up the car and went down Back Street.

Q    Before you get to that, now, what about John Asinari? Did you observe anything happening to him?

A    Well, he was being stabbed, too.

Q    Who was doing that?

A    The other boy, the other passenger.

Q    And do you recall approximately how many times John Asinari was being stabbed?

A    About the same at that time.

Q    Was this person that was in the front seat, was he saying anything to Asinari?

A    The same things, you know.

Q    Swear words?

A    Yes.

Q    And at that time had you observed whether or not John Asinari had given anything to the passenger in the front seat? I am talking about either money or anything like that?

A    I think he gave him money.

Q    Do you know how much?

A    It was less than $5.

Q    Do you know how much he had on him when you left the pizza place?

A    Just a couple of dollars.

Q    I show you this knife and ask you whether or not you can identify that, sir?

A    It looks like the knife that I got stabbed with.

4-57

Q    That was by the operator of the car?

A    Yes.

(Mr. Gaffney displayed a knife to Mr. Balliro.)

MR. GAFFNEY:  I would like to offer this as an exhibit.

MR. BALLIRO:  I object to it.

THE COURT:  Is it consistent in size, color, and appearance with the knife with which you were stabbed?

THE WITNESS:  The size, and I would say the looks of the blade, but I didn't see the handle.

THE COURT:  Very well.

Do you offer it?

MR. GAFFNEY:  Yes.  I am offering it.

THE COURT:  It may be marked.

THE CLERK:  That is marked as Exhibit No. 19, your Honor.

MR. BALLIRO:  My exception.

THE COURT:  Yes.

Exception No. 4-4.

(The aforementioned knife, previously marked Exhibit A for Identification was marked Exhibit No. 19 and was received in evidence.)

4-58

MR. GAFFNEY: May I show this to the jury, your Honor?

THE COURT: Yes.

MR. GAFFNEY: Exhibit 19, Mr. Foreman, and members of the jury.

Q Now, before the car started off, was there anything else said by either of the two people in the car?

A (Pause.) Yeah.

Q What were they saying and who said it?

A (Pause.) I don't remember who said it, one or both of them in the front seat said, "You guys really got it made."

Q Did they say anything else?

A Not that I recall.

Q Okay. And then what was the next thing that happened -- strike that out.

How long were you in this parking lot before the car started off?

A About five minutes.

Q And during that five minutes, how far away from you was the driver of the car?

A About two or three feet.

Q And at some time during the course of the period when he was stabbing you, was he closer to you?

A Yes.

4-59

Q   And did you have an opportunity to also see the passenger in that car?

A   Yes.

Q   How far away from you was he?

A   The same.

Q   Now, do you see that man here in the courtroom that was the operator of that car and that stabbed you on March 22, 1975?

A   Yes.

Q   Point him out, please.

A   Right there (indicating).

Q   Are you pointing to this man here (indicating)?

A   Yes.

         MR. GAFFNEY:  May the record show that the witness pointed out John J. Blodgett?

         THE COURT:  It may.

Q   What was the next thing that happened in that parking lot, sir?

A   They drove down Back Street on to Storrow Drive, and ---

Q   Who was doing the driving?

A   He was.

Q   You are talking about Blodgett?

A   Yes.

Q   Was he the driver of the car at all times from the time you

got into the car until the time you left?

A    Yes.

Q    And did the passenger remain in the front passenger seat at all times during the time that you were in the car?

A    Yes, except that he got out one time.

Q    All right.  Now, as the car started down Back Street and went on to Storrow Drive, did either or both of the people in the front seat, Blodgett or the passenger, say anything to you or Asinari?

A    When they were on Storrow Drive, I remember that one of the two boys in the front said to us, "Are you guys nigger lovers?"  And we didn't answer.

Q    Then what happened?

A    Then they -- Shaughnessy turned around a few times and stabbed us, went after us, you know, with the knife.

Q    He was at both you and Asinari or just Asinari?

A    Both of us then.

Q    How many times did you get stabbed at that point by the passenger?

A    He come around, you know, several times during the ride and just took a few jabs at each one of us, but I remember one time that he turned around and he got into some kind of like a rage and went back and forth to each one of us about ten times or so.

4-61

Q    And where did you get stabbed at that time, what part of your body?

A    All in the arm.

Q    The left arm?

A    Yes, but very few of them actually got through the jacket.

Q    What were you wearing at that time?

A    It was a blue jacket and T shirt.

Q    What was John Asinari wearing?

A    All I remember is a leather jacket.

Q    All right. So when you were driving along Storrow Drive and being stabbed, did you or Asinari say anything to the people in the front seat, Blodgett, or the other man?

A    Yes. Well, we said things like, "Please let us out of here. We just want to live." And one time I remember saying to him that I was bleeding real bad and that I would die if I didn't get out, and they would either swear or laugh. And there was one time they were talking in the front seat back and forth, joking around about how they were going to get rid of us. One of the things was to put is in a barrel and throw us in the river, and they asked us, "How do you like that?" And I remember Shaughnessy, at one time he said that we aren't leaving the car until we are dead. There was another time that Shaughnessy also said, "How would you like to get your eyes

4-62

poked out?" to both of us.

Q    Now, you have mentioned the name Shaughnessy. Did you at some time later view some people in a lineup? Did you pick out the passenger at some time? Just Yes or No?

MR. BALLIRO:  I object to that.

THE COURT:  I will see counsel. Meanwhile, we will take the morning recess.

(The jury retired from the courtroom.)

THE COURT:  All right. Give me the last question.

(The last question was read.)

MR. BALLIRO:  I object to it.

MR. GAFFNEY:  Well, he has been mentioning his name without objection. Shaughnessy's name has been mentioned all the time, so I just thought ---

MR. BALLIRO:  You mean because I didn't object?

MR. GAFFNEY:  Yes. I thought that I would just ---

MR. BALLIRO:  I will start objecting all the time if that is what you want me to do. I give you a leg and you want an arm, too.

MR. GAFFNEY:  What difference does that make?

THE COURT:  Don't take any more. Let them settle it.

4-63

(The morning recess was taken from 11:35 a.m. until 12:00 noon.)

MR. GAFFNEY: All right, your Honor?

THE COURT: Yes.

Q  Prior to the recess, I believe you told us that the car was being driven down Storrow Drive?

A  Yes.

Q  And do you know what other roads or streets the car was driven on?

A  No.

Q  And how was the driver driving that car? Can you describe the manner in which it was being driven?

A  Well, there was one time on Storrow Drive that he swerved real quick into the left lane, and they were going under an overpass, and someone in the car told him, "Don't blow it now. Slow down." And after that as far as I remember they drove pretty carefully.

Q  Did the car stop at any red lights at any time?

A  Yes.

Q  And did anything happen while the car was stopped at any red lights?

A  Yeah. Shaughnessy would turn around and jab at us a couple of times.

Q  Did he say anything at that time?

4-64

A    He would swear in the same way.

Q    And what was your condition at that time?

A    I was just getting a little tired; I guess from losing blood.

Q    Where were you bleeding from?

A    Mostly from here and here (indicating).

Q    You are referring to what?

A    The left hand and one thing up here (indicating).

Q    The left arm?

A    Yeah.

Q    And was there much blood that you could observe?

A    Yeah.  I know that it was wet, and I remember the boy beside me on the left ---

Q    John Asinari?

A    No, no, on the left.  He said, "He is bleeding all over me.  We got to get rid of these guys."

Q    When he said that, did either one of the two people in the front seat do anything?

A    Yeah.  Shaughnessy turned around and he jabbed at us a couple of times because of the bleeding.

Q    Because you were bleeding?  Is that both you and Asinari?

A    Yes.

Q    And can you describe the movements of the hand when the person or persons in the front seat had stabbed you?

4-65

A   Coming down like so (indicating).

Q   A downwards movement?

A   Yeah.

Q   All right.  What was the next thing that happened?

A   I remember it was quiet for about five minutes, and I was leaning against John and I looked up and Shaughnessy had this gun pointing it at John.

Q   Where was he pointing it?

A   At his head, and he pulled the trigger, and there was no bullet.  Then he pulled the trigger again and John yelled out, "Don't do it," and the bullet went off.  Then he aimed it at me and I said, "Please don't do it," and I threw my arms up.

Q   Like what?  Show the jury how you threw your arms up?

A   Like so (indicating), and it was only God that saved me then because the bullet went through so and into this hand (indicating).

Q   Well, it went through where?

A   Through the left arm.

Q   All right.  Then where?

A   Into this hand like so, and it lodged into the wrist (indicating).

Q   Of your right hand?

A   Yes.

4-66

Q    And were you bleeding at that time?

A    Yes.

Q    What happened then after you were shot?  What did you do?

A    I played dead.

Q    How did you do that?

A    I was leaning on John.

Q    And did either one of the two people say anything to Asinari after you did that?

A    Yeah.  I remember Shaughnessy said, "How does it feel to have your friend dead beside you?"  And John didn't answer him.

Q    The car was driven all during this time by Blodgett?

A    Yes.

Q    Then where did you go?  After the gun was fired, was there some talk about ---

A    Well, after the gun was fired, they started talking about where to get rid of us.

Q    What was said?

A    Well, that actually happened a bit later, but before then, a lot of other things happened.

Q    Tell us what happened.

A    From that time on until they let us go, nothing happened to me.

Q    Tell us what you observed happen to John Asinari.

4-67

A   Shaughnessy kept on stabbing John.

Q   Did he say anything at that time?

A   Well, he kept on turning around and saying, "You are still alive," and when he would see that John was still alive, he stabbed at John. He kept on doing it a lot, and there was one time when he told the two boys in the back to hold John up. I remember that they reached over and I can remember being squeezed because they had reached over to get John and they held him up and Shaughnessy was going after his chest. I could see it.

Q   How many times?

A   Maybe 10 or 20 times right up in this area here (indicating). Then he went after his neck.

Q   Did he say anything at that time?

A   Yeah. He said, "I know where the jugular veins are."

Q   What did he do then?

A   He went after his neck, and he did stab him in the neck one time. I know that John made a sound, you know, that kind of, oom, like that.

Q   Then what happened?

A   Then they started saying that they got to get rid of us, and they drove into an area they knew real well because they knew all the roads, and ---

THE COURT:   Just try to answer the question.

4-68

THE WITNESS:  Okay.

Q   Before that, was there some conversation about the gun?

A   Oh.  Shaughnessy said that he wanted to get some more bullets, so they stopped the car.

Q   Do you know where they stopped the car?

A   No.  He got out and he ran across the street up into these apartments, and they looked like low-rise apartments on the left, and he came back in a few minutes and then they took off again.

Q   How long had you been in the car -- you and Asinari been in the car at this time from the time you were picked up by these people time-wise?

A   About 35 or 40 minutes.

Q   Well, after he got back in the car, what was the next thing that happened?

A   Then they drove -- then they drove and were trying to find a place to let us off.

Q   When you say, "let us off," what do you mean?

A   To dump us.  They were ---

Q   To what?

A   To dump us.

Q   What did they say in that vein or connection?

A   They were looking -- they were driving -- they would drive and stop the car, and then they would say, "No, this isn't

4-69

a good spot. Let's move over there," and they would drive down there and stop, then somebody would say, "I know a better place over here." Then they would drive down and stop. And this happened a few times. Finally, the car stopped.

Q    Do you know where it stopped?

A    I didn't at the time.

Q    Do you now know where it stopped?

A    Yeah.  It was somewhere around Mr. O'Neill's house.

Q    About what time of the morning was this on March 22d, 1975?

A    About 4:00.

Q    4:00 a.m.?

A    Yes.

Q    Are you certain of the time or are you just estimating?

A    I'm estimating.  I don't know what time it was.

Q    What was your condition at that time?

A    I was dizzy by then because of losing the blood, and when th car stopped, I looked up -- no, I didn't look up, but I tapped John with my right leg. Then he said, "Bob, if you want to live, get out now." The front seat was empty and the driver's door was open, and there was nobody beside me to my left , and John got out.  I went behind him, and all I remember was running.  I just looked up and I saw a

dark spot down the road. I ran down the road into the dark spot, climbed over some boxes, and I laid down there. I remember them saying, "Get him. Get him," and running footsteps. I heard a gun go off, and then after about five minutes or so, I heard tires screeching, so I climbed back over the boxes into the street, and I yelled out, "Help," about four times. I fell against a car and then on to the sidewalk, and then Mr. O'Neill come out and helped me out. That was God's doing.

Q   Did somebody put a tourniquet on your arm?

A   Yes, a young guy.

Q   Do you know who he was?

A   I know now who it was, but I didn't at that time.

Q   Was it Mr. Bonanno?

A   Yes.

Q   And while you were lying on the sidewalk -- was that East Second Street? Do you know where it was at that time?

A   No.

Q   And did somebody do something with reference to giving you mouth-to-mouth resuscitation?

A   Well, Mr. O'Neill, he breathed for me for quite a while. He kept me going.

Q   At some time you were removed to the City Hospital?

A   Yes. Then they took me to the City Hospital.

Q   Then you were removed to the Peter Bent Brigham Hospital?

A   Yes, later on that afternoon.

Q   The same day?

A   Yes.

Q   How long did you remain in the Peter Bent Brigham Hospital?

A   Two weeks.

Q   And did you observe any of your wounds?

A   Yes.

Q   And where were the wounds that you observed?

A   On the left arm and one on the left thigh.

Q   Do you have some scars now from those wounds?

A   Yes.

MR. GAFFNEY:  Could I have him step down, your Honor, and show the jury these scars?

THE COURT:  You may.

MR. GAFFNEY:  Step down here.

(The witness complied.)

THE WITNESS:  This one here ---

THE COURT:  No conversation.  The reporter can't hear it.

MR. GAFFNEY:  Step up here.

(The witness walked in front of the jury box.)

MR. GAFFNEY:  All right.  You can resume the witness stand.

4-72

(The witness resumed the witness stand.)

Q    I show you Exhibit 16, Mr. Moses, and tell us whether or not you recognize this wallet?

A    Yes.

Q    What do you recognize it as?

A    That is mine.

Q    Is that the wallet you had on you on March 21 and 22, 1975?

A    Yes.

Q    This is also your operator's license?

A    Yes.

Q    Was that in your wallet on March 22, 1975?

A    Yes.

Q    Now, at some time, Mr. Moses, while you were in the Peter Bent Brigham Hospital, were you shown a group of photographs?

A    Yes.

Q    Do you remember what date that was?

A    I was shown some on Sunday. That was a book, and then the next Thursday, I think they showed me about ten photos.

Q    All right. And at that time when you were shown that group of photos, did you pick out a photograph of the operator of the car?

MR. BALLIRO:  I object, your Honor.

4-73

MR. GAFFNEY:  I will withdraw that.

Q    Did you pick out a photograph?

MR. BALLIRO:  I object.

THE COURT:  I will allow him to answer Yes or No.

MR. BALLIRO:  My exception.

Exception No. 4-5.

THE WITNESS:  Yes.

Q    Do you see that man here in the courtroom that you picked out?

A    Yes.

Q    And will you point to him again, please?

MR. BALLIRO:  I object.

THE COURT:  I will allow it.

MR. BALLIRO:  My exception.

Exception No. 4-6.

THE WITNESS:  Right there (indicating).

Q    You are pointing to the defendant?

A    Yes.

Q    Did you undergo an operation at the Peter Bent Brigham Hospital that you know of?

A    Well, two -- well, about two.

Q    Two operations?

A    Yes.

Q    Do you know what type of operations they were?

4-74

A     One was for the wound and the other one was to put the nerve back together.

Q     Which nerve was that?

A     This one right here (indicating).

Q     You are pointing to your left upper arm?

A     Yes.

Q     Did something occur with your wrist?

A     Well, the wrist was down like so, and after about six months, it come back, you know (indicating).

Q     That is the wrist that you received the gunshot wound in?

A     No.

          MR. BALLIRO:   I object to that, your Honor.

          MR. GAFFNEY:   He answered, "No."

Q     Which wrist ---

          MR. BALLIRO:   May that question be stricken?

          THE COURT:   Strike the question and the answer.

Q     Did you receive a gunshot wound?

A     Yes.

Q     Where did you receive the gunshot wound?

A     Through here and it entered ---

Q     Your left --- identify which part of the arm you are referring to.

A     Forearm.

Q     The left forearm and then into the right hand?

4-75

A    Right wrist.

Q    Which wrist are you talking about that you had a wrist drop

A    The left.

Q    And can you recall approximately how many times you were stabbed during the course of the time you were in the car?

A    (Pause.)  They tried about maybe 30 or 40 times.

Q    What do you mean by, "they tried"?

A    That they would actually come at me with the knife, but only a certain number actually wounded.

Q    Penetrated?

A    Yes.

Q    How many was that, if you know?

A    About eight.

            MR. GAFFNEY:  You may inquire, Mr. Balliro.

                    Cross-Examination

            MR. BALLIRO:  May I have Exhibit 19, please?

Q    (By Mr. Balliro)  Now, Mr. Moses, you were a close friend of Mr. Asinari, isn't that correct?

A    Yes.

Q    And you were anxious, of course, to assist the police in apprehending those that were responsible for committing those acts on you and Mr. Asinari?

A    Yes.

4-76

Q    You wanted to do everything that you could to help them, isn't that correct?

A    Yes.

Q    Now, at some time after you were in the hospital, did you find out that a man by the name of Shaughnessy had been arrested by the police?

A    Yes.

Q    And do you remember in relation to March 22d, 1975, about when it was that you found out that Shaughnessy had been arrested?

A    He was arrested on Monday, I think.

Q    I see.  So that would be the 24th?

A    Yes.

Q    Now, you have identified Exhibit 19 as looking like the knife that was wielded by the man who struck you?

A    Yes.

Q    Now, you don't mean that that looks like the knife, do you?  Does that look like the knife?

A    Yes.

Q    Well, you didn't see the handle of the knife that the man was holding, did you?

A    No.

Q    So that you only saw a blade, isn't that correct?

A    Yes.

4-77

Q    And you didn't notice the color of the knife that the man was holding, did you?

A    Not the color of the blade--I mean of the handle.

Q    All right.  But you noticed the color of the blade?

A    Yes.

Q    Well, isn't the fact of the matter, Mr. Moses, that blades look pretty much alike as far as color is concerned?

A    Yes.

Q    So that the color of the blade of the knife that you saw that night did not look much different than the color of a knife that you might have seen any time?

MR. GAFFNEY:  Objection.

THE COURT:  He may answer that.

Q    All you mean to say to this jury with respect to Exhibit 19, the knife, is that the blade looks like the blade of the knife that you saw in the hand of the man that was sticking you, isn't that correct?

A    Yes.

Q    You don't mean to say that the knife itself, the entire knife, looks like what it was that the man had in his hand?

A    No.

Q    Now, among the things that the officers who came to visit you in the hospital later that day on March 22d were

4-78

concerned with was a description of the four men in the car, isn't that correct?

A    Yes.

Q    And is it fair for me to say that that was the major thing at that point they were interested in trying to find out as much as they could about the men that were in that car so that they could apprehend them, is that correct, Mr. Moses?

A    Yes.

Q    That was the primary thing that they were interested in, is that right?

A    Yes.

Q    And as far as the two people that were in the back seat with you where you and Mr. Asinari were sitting, what description do you recall furnishing the police the first time you spoke to them in the hospital?

A    I remember saying they were young, about 17; that one had light hair and that one had dark hair. I don't remember much more than that.

Q    Well, do you remember saying anything much more than that to them about the two young people in the back of the car?

A    No.

Q    Did they ask you whether they were black or white?

A    Yes.

4-79

Q    And what did you tell them?

A    White.

Q    So that you did see them sufficiently to determine what their color was?

A    Yes.

Q    And did they ask you whether you could recall or could observe what the men in the back seat were wearing?

A    I don't remember if they asked me.

Q    Well, do you remember saying anything to them about it?

A    No.

Q    And whether or not they were wearing hats?

A    I don't remember.

Q    Do you remember whether they were wearing eyeglasses?

A    I don't remember.

Q    Or anything in connection with their clothes?

A    I don't remember.

Q    Do you remember if they asked you any questions about those things that I have just mentioned?

A    No.

Q    I see.  Do you recall the first occasion when the police came to interview you in the hospital?

A    Yes.

Q    What day was that?

A    That was right after it happened.

4-80

Q   So that was shortly after you were taken to the hospital?

A   Yes.

Q   It was sometime in the early morning of March 22d, 1975?

A   Yes.

Q   And can you recall approximately how long it was after you had been in the hospital?

A   About a half hour, maybe.

Q   And do you remember what police officer it was that was interviewing you?

A   No.

Q   Do you recall how many were there?

A   About three or four.

Q   And do you recall how long they spoke to you?

A   About 15 minutes.

Q   And do you remember if you gave them a description of the men that were in the front seat at that time?

A   Partially.

Q   Well, you didn't, of course, purposely give them a partial description?  You didn't do that on purpose?

A   Right.

Q   Was there some reason why you gave them only a partial description this first time?

A   As much as I knew -- I gave them what I knew.

Q   I see.  You were conscious, of course, when you were

4-81

talking to the officers?

A    Yes.

Q    And does it refresh your memory as to who those officers might have been if I tell you that one was named Detective Cotter?

A    No.

Q    That doesn't refresh your memory at all?

A    No.

Q    Have you since talked to or seen the officers that you recall as having first interviewed you there at the hospital?

A    I don't remember who was there, but I remember the detectives later on.

Q    I see. Well, you gave them as much as you could remember at that time, is that right?

A    Yes.

Q    And is it fair to say that your memory was fresher then than it is today with respect to a description of the men that were in the front seat?

A    Yes.

Q    That was just within a matter of hours of this having happened to you, isn't that correct?

A    Yes.

Q    And you have testified that you had a long period of time

4-82

within which to make those observations, isn't that right?

A    Yes.

Q    And at least at certain times the lighting was very, very clear?

A    Yes.

Q    Isn't that correct?

A    Yes.

Q    And you were very close to both the passenger and the driver in the front seat, isn't that right?

A    Yes.

Q    Now, do you remember the description that you gave those first officers on March 22d?

A    No.

Q    You have no memory of it now?

A    No.

Q    Well, a few moments ago, Mr. Moses, you said that you gave them only a partial description. Do you remember the partial description that you gave them?

A    I remember saying that the driver was fairly tall, about, I think, a little over six feet; that he was broad shouldered, and a had a big jawbone. That is all I remember about him; and about Shaughnessy, that he had -- oh, yes, and blondish hair. Both of them had blondish

hair, and that Shaughnessy's hair came down pretty long, I think almost to his shoulders, and that he was a little shorter, and that he had small eyes and rough mouth. I am not sure about him any more than that.

Q As far as the driver was concerned, you had never seen the driver of that car standing up, did you?

A No.

Q So that your estimate of the driver's height was totally based upon whatever viewing you had of him in a seated position, isn't that correct?

A Yes.

Q All right. Now, the description that you have just testified to, is that what you recall having told the police officers at that first interview of you in the hospital?

A Yes.

Q When -- do you recall the next interview, if any?

A The next day.

Q That would be Sunday, March 23d?

A No. They come up to the City Hospital on Saturday, too.

Q All right. But you told us about that, have you not?

A No. This is different. This was a few hours later.

Q I see. Do you recall the officers that came to you then?

A I know Sergeant Childers was one of them. He came with a big book. I don't remember saying anything or looking at

4-84

the book at that time, not until the next day.

Q    Well, on that day, Saturday. We will just stop there for a moment.

A    Yes.

Q    You do recall a Sergeant Childers coming to you with a book of photographs?

A    Yes.

Q    And you understood, did you not, that this book contained pictures of people that might be suspects in this case?

MR. GAFFNEY:  Objection.

THE WITNESS:  Yes.

MR. GAFFNEY:  Objection.

THE COURT:  I will allow it.

Q    You understood that was the purpose for it?

THE COURT:  He answered that.

THE WITNESS:  Yes.

Q    And do you recall how many pictures you looked at?

MR. GAFFNEY:  When?

MR. BALLIRO:  At that time.

MR. GAFFNEY:  Saturday?

THE WITNESS:  On Saturday?

Q    Yes, when Sergeant Childers was there to show them?

A    I didn't look at a book.

Q    You didn't look at a book?

4-85

A    No.

Q    Did you look at some pictures that day?

A    No.

Q    I see. Did you furnish again on that day, March 22d now, either to Sergeant Childers at the time you are now talking about, or at some other time that day, any additional description of the men in the car, first in the driver's seat and the passenger seat?

A    I don't remember.

Q    How about the next day, March 23d, Sunday? Do you recall some police officers coming down that day?

A    Yes.

Q    And do you remember who they were?

A    I remember Sergeant Childers.

Q    This was on Sunday, March 23d now?

A    Yes.

Q    Okay. Was he with other officers?

A    I take that back. I don't remember who it was.

Q    If I suggest to you it was a Detective Cotter, does that help your memory?

A    Yes.

Q    You now remember that at least one of the officers was Detective Cotter?

A    Yes.

4-86

Q    Okay.   And he too asked you to give your best memory of describing the men in the front seat, did he not?

A    Yes.

Q    And do you recall the description that you furnished to Detective Cotter?

A    Well, the thing that I remember ---

Q    Do you remember what you furnished to him, Mr. Moses, that is the question.

A    I remember telling him about a big jawbone of the driver, and about six foot tall, light hair.  That is all I remember

Q    Do you remember giving an approximation of the man's age?

A    Yes.

Q    What was the approximation you gave him of the man's age?

A    To my memory it was from about 22 to 26 years old.

Q    Would you look at this piece of paper that I am handing you, and I ask you to read to yourself what I am directing your attention to.   You see what I have underlined there?

A    Yes.

Q    Would you read it to yourself?

A    Yes.  This is what I ---

Q    Now, does that help refresh your memory as to the approximation of the age of the driver of that car?

A    No.

Q    Well, does it help refresh your memory as to what you told

4-87

Detective Cotter?

A    Yeah.

Q    And you told him that the driver in your estimation was 20 to 22 years of age, isn't that correct?

A    Yes.

Q    And you told Detective Cotter that the driver of the car had light blond curly hair, didn't you?

A    Yes.

Q    And that is your memory, is it not, that the man had light blond curly hair?

A    No.

Q    That is not your memory?

A    I didn't really mean curly.

Q    Well, tell us what you really meant.

A    Wavy.

Q    I see.  Well, now, do you recall the next time you spoke to police officers and gave a description of the driver of the car?

A    No.

Q    Well, do you recall a taped conversation that you had with Sergeant John Daley of the Boston Police?

A    Yes.  That was -- that was the very first one at the hospital.

Q    Yes.  And that is now the conversation that you had with

4-88

Q  Detective Cotter in which you described the man as having light blond curly hair, is that right?

A  Yes.

Q  And, of course, you were trying to tell the truth at that time; no question about that, isn't that right?

A  Yes.

Q  All right. And your memory, you agree, was better then than it is today, isn't that correct?

A  Yes.

Q  And do you recall telling Detective Daley in this taped conversation that one of the guys in the front seat had blond hair, one of the guys had curly hair who was the driver. Do you remember telling that to Sergeant Daley?

A  Yes.

Q  So that you told Sergeant Daley the driver had curly hair, and then you told Detective Cotter the next day that the driver had curly hair, isn't that correct?

A  Yes.

Q  And your memory was better then than it is today, isn't that correct?

A  Yes.

Q  Now, do you recall on how many occasions the police brought pictures to you for you to view?

A  There was a book, and then there was separate photos.

4-89

Q    All right.  When was the book brought to you?

A    Well, on Saturday, but I didn't look at it, then on Sunday.

Q    Is it on Sunday that Detective Childers brought this group of pictures from which you selected one picture?

A    Yes.

Q    That would be Sunday, March 23d?

A    Yes.

MR. BALLIRO:  May I see that enveclope with the 13 pictures that was marked for identification?

THE CLERK:  I brought them down to my office.

MR. BALLIRO:  May we approach the side bench, your Honor?

THE COURT:  Yes.

(Bench conference recorded as follows:)

MR. BALLIRO:  Apparently I incorrectly assumed that those pictures would be here, your Honor.

THE CLERK:  I have them down in the office, but it will take me a few minutes to get them.

MR. BALLIRO:  I need them at this state of my cross-examination

THE COURT:  Yes.  All right.

Where are they, down in the Clerk's office?

THE CLERK:  I am not sure where they are.

4-90

THE COURT:  Short recess.

(End of bench conference.)

THE COURT:  You may be excused for just a short time.  I will stand in recess.  We will get them.

MR. BALLIRO:  All right.

(A short recess was taken from 12:40 until 12:50 p.m.)

Q  Mr. Moses, would you give us now your best estimate of the length of the hair of the driver of the car?

A  Now?

Q  Yes.

A  Short.

Q  Well, what I am asking you for at this time is what is your best estimate of the length of the hair of the man that was driving that automobile on March 22d, 1975?

A  (Pause.)  About a half an inch above the shoulders.

Q  Would you stand up, please, for the jurors and point on yourself what you mean by that?

A  I can't.

Q  Would you do it on me?

A  Can you turn around?

Q  Oh, sure.  Would you touch me as to where you are pointing so that I can feel it?

A  About here (indicating).

4-91

Q    Would you please do it on Mr. Gaffney so I can see it?
I can't visualize it from behind.

A    About here (indicating on Mr. Gaffney.)

Q    Okay.  Well below the ears.  There is no question about
that, isn't that right?

A    Yes.

Q    Would it be fair to say ---

THE COURT:  You may be seated.

THE WITNESS:  But ---

Q    I'm sorry.  You wanted to say something?

A    That is in the back.

Q    All right.  I understand.

A    It covered the ears a little bit.

Q    Yes.  Would you say the nape of the neck; it was touching
the nape of the neck?

A    What do you mean by, "the nape"?

Q    Well, all right.  You have pointed it out and I am content
with that.

Now, let's get to this identification process on
March 23d, Sunday, Sergeant Childers conducted with you.
He brought a number of pictures for you to look at, isn't
that correct?

A    Yes.

Q    And does it help refresh your memory if I suggest to you

4-92

that there were 13 pictures rather than 10 that he showed to you?

A   Not on Sunday.

Q   Not on Sunday. How many pictures did he show you on Sunday?

A   A big book; over 200.

Q   That wasn't Saturday? I am just trying really to help you remember.

A   On Saturday, I didn't look at the book. On Sunday I looked at the book.

Q   I see. And about how many pictures did you look at on Sunday?

A   Over 200.

Q   And did you select any pictures from a group of pictures?

A   Yes, five.

Q   And were those the only pictures that you looked at on Sunday?

A   Yes.

MR. BALLIRO: May we approach the bench, your Honor?

THE COURT: You may.

(Bench conference recorded as follows:)

MR. BALLIRO: I didn't want to say this in front of the jury. That's why I asked you if we could come up to the side bench, your Honor.

4-93

I would ask the Court to direct the Commonwealth to furnish me with the five pictures that he selected out of the book for purposes of cross-examination.

THE COURT: What do you say?

MR. GAFFNEY: I don't have any pictures that he selected out of the book.

MR. BALLIRO: Well, may the Commonwealth be directed to make inquiry of the officers?

MR. GAFFNEY: I have already made inquiry and they don't have any five pictures that were selected out of the book. The only picture that was selected was Shaughnessy's picture. To my knowledge, the other pictures that were indicated by him were that it looks a little like his jaw, hairline, or something like that.

MR. BALLIRO: May I have those five pictures?

MR. GAFFNEY: I don't have any of those five pictures because I don't know what they are. I have inquired and nobody knows which pictures they were with the exception of Shaughnessy's picture.

THE COURT: Who was the officer there at the time he looked at the book with the 200 pictures and picked out five, he said. Who was the officer?

MR. BALLIRO: That was Childers.

MR. GAFFNEY: He said Childers first, but then

4-94

he changed it to Cotter, didn't he?

MR. BALLIRO: No, he did not. He just said Childers.

THE COURT: Then I direct you during the noon hour, it now being five minutes of 1:00, to inquire of Childers ---

MR. GAFFNEY: I have already inquired, but I will inquire again, but I assume the answer will be the same, that they don't have the pictures.

THE COURT: Let me know at five minutes of 2:00.

MR. BALLIRO: While we are here, your Honor, it might be well for me to suggest that if the Commonwealth can ascertain whether this witness selected any other pictures that during the recess would be a good time to locate them. Of course, I am going to ask him about additional pictures.

MR. GAFFNEY: What do you mean by, "additional pictures"?

MR. BALLIRO: Well, I don't know. I mean during the ---

THE COURT: I have made my order. Now, I will limit it. He said he picked out five pictures. I direct you to ask Lieutenant Childers ---

MR. GAFFNEY: Sergeant.

4-95

THE COURT: Sergeant Childers and inquire and let me know at five minutes of 2:00.

MR. BALLIRO: Right. Thank you, your Honor.

(End of bench conference.)

THE COURT: We will take our regular noon recess.

(The luncheon recess was taken beginning at 12:55 p.m.)

— — — — —

4-96

## AFTERNOON SESSION

(The Court came in at 2:10 p.m.)

THE CLERK: Your Honor, the deputy sheriff informs me that the jury did not leave the building during the noon luncheon.

May the record indicate that the defendant, John Blodgett, is present, together with his attorney, Mr. Balliro, and Mr. Gaffney is present on behalf of the Commonwealth.

At the time of the noon recess, Robert Moses was on the stand, having been placed under oath and testifying.

THE COURT: You may proceed.

MR. GAFFNEY: May we go to the side bar for a moment, your Honor?

THE COURT: Yes.

(Bench conference recorded as follows:)

MR. GAFFNEY: Your Honor, in accordance with your instructions prior to the luncheon hour, I have checke with Sergeant Childers, and he does not have any photos other than those that are already marked for identification and he does not know which photos were selected. None were identified. He has informed me that none were picked out by the witness so that they were not taken from the

4-97

book and marked as such that they would not be identifiable to bring into court.

Furthermore, he informs me that the book containing 250 photos which was shown to the witness was subsequently broken up into three different books and made larger, so that we don't have any other pictures other than those that are marked for identification in court.

THE COURT:  Thank you.

(End of bench conference.)

MR. BALLIRO:  May I proceed, your Honor?

THE COURT:  Yes.

Q  Mr. Moses, prior to recessing for lunch, you testified that you picked five pictures from a group of some 200-odd pictures that were shown to you by Sergeant Childers, is that correct?

A  Yes.

Q  And were any of those five pictures pictures of the passenger in the front seat of the car that evening?

A  Yes.

Q  And how many of the five were pictures of the passenger?

A  One.

Q  Were any of those pictures pictures of the man that you say was the driver of the car?

4-98

A    No.

Q    Were any of the pictures that you selected pictures of the two men that were in the back seat of the car with yourself and Mr. Asinari?

A    No.

Q    Do you recall testifying with respect to the circumstances that happened that night in the South Boston District Court on April 4th, 1975, at a probable cause hearing on this matter?

A    Yes.

Q    Mr. Blodgett was not there that day, is that correct?

A    Yes.

Q    And the Commonwealth was not represented by Mr. Gaffney that day, was it?

A    No.

Q    There was another man there that was asking the questions for the Commonwealth, isn't that correct?

A    Yes.

Q    And do you recall being asked questions about the photographs that you were shown, or being asked those questions on April 4th, 1975?

A    Yes.

Q    And do you recall being asked how many photographs you were shown at the hospital?

A    Yes.

Q   And do you remember that that questioning of you was about the same showing that we are talking about now, isn't that correct?

A   Excuse me?  I don't understand.

Q   All right.  I will reframe the question for you. When you were being asked the questions at the South Boston District Court about the pictures that you were shown at the hospital, the pictures that you were being asked about are the same pictures that I am asking you about now?

A   Yes.

Q   And you said, did you not, in your testimony before the District Court that you picked out five pictures, isn't that correct?

A   Yes.

Q   And you were asked by the Assistant District Attorney -- Page 55, Mr. Gaffney -- that was representing the Commonwealth in the District Court, you were asked the following question: "Question:  What did you say about the five pictures?"

MR. GAFFNEY:  Excuse me.  I object.  This was not the Assistant District Attorney that was asking the questions.

MR. BALLIRO:  Well, whoever it was.

4-100

MR. GAFFNEY: Mr. Farese.

MR. BALLIRO: I'm sorry. It was counsel for Mr. Shaughnessy at that time that was asking the questions.

THE WITNESS: Yes.

Q  All right. And he asked you, did he not, the following question: "Question: What did you say about the five pictures?" Do you remember him asking you that question?

A  Yes.

Q  And do you remember saying -- this is your answer: "Three of those were the driver."

A  Yes.

Q  Well, now, were you testifying truthfully on April 4th, 1975?

A  Yes.

Q  And were three of those pictures of the driver of that automobile on March 22d, 1975?

A  No. I didn't mean it that way.

Q  Were they or were they not?

A  No.

MR. BALLIRO: May I have those other pictures, please?

(The Clerk passed Mr. Balliro an envelope containing photographs.)

Q  Now, you recall your testimony concerning the pictures that

4-101

were shown to you by Sergeant Childers, the group -- the smaller group of pictures?

A    Oh, yes, sir.

Q    And do you have a memory now of that smaller group of pictures that was shown to you by Sergeant Childers?

A    Yes.

Q    And were they 13 pictures that you were shown?

A    Yes.

Q    And did the men in those 13 -- they were all men in the pictures?

A    Yes.

Q    And they were all of white men?

A    Yes.

Q    Do you recall whether or not they resembled each other?

A    I don't really understand the question.

Q    Well, did one man stick out of those 13 pictures that you were shown, or did all of these 13 men that were portrayed in those photographs have somewhat similar or identical features?

A    I still don't understand.

Q    Well, did -- how many of the men had hair that was light in the 13 pictures that you were shown?

A    I don't remember.

Q    If I suggest to you that only one man that was portrayed in

4-102

those 13 pictures had light hair, does that help refresh your memory?

A   No.

Q   How many of the men in those 13 pictures had long wavy hair?

A   I don't know.

Q   Well, if I suggest to you that just one of the men in those 13 pictures had long wavy hair, does that help refresh your memory?

A   No.

MR. BALLIRO:  Your Honor, I would like these to have some markings pertinent to the trial of the case as opposed to the pretrial hearing.

Is there some way we can do that so that I can refer to them for the record?

THE COURT:  Just the one?

MR. BALLIRO:  Yes, your Honor.  Those were marked in the pretrial hearing.

THE COURT:  I can have them marked for identification, if that is what you wish.

MR. BALLIRO:  Well, I am going to ask that they be marked as exhibits at the trial, your Honor.

THE COURT:  Your request now is that they be marked in some way so they can be distinguished one from the

4-103

other?

MR. BALLIRO:  Yes, your Honor.

THE COURT:  I will have them marked for identification.

MR. BALLIRO:  All right.  Okay.  Fine.

THE COURT:  Do you want them marked separately?

MR. BALLIRO:  I am going to refer to them with the single one and the others as a group.

THE CLERK:  May the single one be marked B, your Honor?

THE COURT:  B for Identification.

(The aforementioned photograph was marked B for Identification.

THE COURT:  Keep that separate.

The other photographs may be marked C for Identification.

(The aforementioned 12 photographs were marked C for Identification.)

MR. BALLIRO:  May I approach the witness, your Honor?

THE COURT:  Yes.

Q    Mr. Moses, I am going to ask you to look at a group of pictures that have been marked C for Identification.  Would

4-104

you look those 12 pictures, please, and do it carefully, if you will.

A    Yes.

Q    Have you looked through those 12 pictures?

A    Yes.

Q    And did any of the faces portrayed in those 12 pictures have any features that are similar to the man who you say was the driver of the car that evening?

A    Yes.

Q    Which of them -- select the pictures that you say have the features similar to the man.

A    Well, prominent jaw, the color of his hair ---

            THE COURT:  Just pick out the pictures.  Don't say anything.

Q    Now, with respect to two of those 12 pictures that you have picked out, you say that the one I now hold in my right hand shows a man who has a similar jaw to the man that was the driver of the automobile, is that correct?

A    Somewhat similar.

Q    And does the hair look at all similar?

A    No.

Q    As a matter of fact, that hair is black more or less in this picture, is it not?

A    It is dark.

4-105

Q    You wouldn't say that it was blond, would you?

A    No.

Q    Well, at any rate, you say that that picture shows a man whose jaw is somewhat similar to the driver of the car?

A    Yes.

MR. BALLIRO:  May this be marked separately for identification, your Honor.

MR. GAFFNEY:  Let me take a look at it.

THE CLERK:  May it be marked B-1, your Honor?

THE COURT:  Yes.

(The aforementioned photograph was marked B-1 for Identification.)

Q    The picture I am showing to you now is the one that you have selected from the group of 12 as having hair color similar to the man that was the driver of the automobile that evening, is that correct?

A    Yes.

MR. BALLIRO:  May this be marked separately, your Honor.

(Mr. Balliro showed a photograph to Mr. Gaffney.)

THE CLERK:  B-2, your Honor?

THE COURT:  It may be marked B-2.

(The aforementioned photograph was marked B-2 for Identification.)

4-106

Q   Now, Mr. Moses, with respect to the ten that remain, do any of them portray a man who has hair the length of the driver of the automobile that evening?

A   (Looking through photographs.)

Q   This group of five?

A   Yes.

(Mr. Balliro showed five photographs to Mr. Gaffney.)

MR. BALLIRO:   May these be marked separately?

THE CLERK:   May they be placed in an envelope and marked B-3, your Honor?

THE COURT:   They may.

(The aforementioned five photographs were placed in an envelope and the envelope was marked B-3 for Identification.)

Q   Now, Mr. Moses, I am going to show you a photograph that has been marked B for Identification, and I ask you to look at it.

Have you looked at it?

A   Yes.

Q   And is that the picture you selected from the group of 13 pictures that were shown to you?

A   (Pause.)   Yes.

4-107

Q  Is there some doubt in your mind as to whether or not it is?

A  No.

Q  Now, does that picture portray a man who has the length of hair that the driver of the car had that evening?

A  Yes; maybe a little bit shorter.

Q  But approximately the same?

A  Yes.

Q  Now, B for Identification, does it have any similarities to the other 12 pictures that were in the group of 13 that were shown to you?

A  Yes.

Q  And what are the similarities?

A  Well, I said the jawbone.

Q  Right.

A  And the color of the hair and the length of the hair.

MR. BALLIRO:  I am going to ask that these all be marked as exhibits, if your Honor pleases.

If I may, I am going to display them to the jury in groups as were identified by the witness.

MR. GAFFNEY:  I couldn't hear you.

MR. BALLIRO:  I am going to display them to the jury in groups as they were identified by the witness.

THE COURT:  They may be marked.

4-108

THE CLERK:  Your Honor, may B for Identification be marked as Exhibit 20?

THE COURT:  Yes.

(The aforementioned photograph previously marked B for Identification was marked Exhibit No. 20 and was received in evidence.)

THE CLERK:  Your Honor, may B-1 for Identification be marked as Exhibit 21?

THE COURT:  It may.

(The aforementioned photograph previously marked B-1 for Ident. fication was marked Exhibit No. 21 and was received in evidence.)

THE CLERK:  May B-2 for Identification be marked as Exhibit 22?

THE COURT:  It may.

(The aforementioned photograph previously marked B-2 for Identification was marked Exhibit No. 22 and was received in evidence.)

4-109

THE CLERK:  Your Honor, may B-3 for Identification be marked as Exhibit 23?

THE COURT:  It may.

(The aforementioned five photographs previously marked B-3 for Identification was marked Exhibit No. 23 and was received in evidence.)

THE CLERK:  And, finally, may C for Identification be marked as Exhibit 24?

THE COURT:  It may.

(The aforementioned envelope containing the remaining photographs previously marked C for Identification was marked Exhibit No. 24 and was received in evidence.)

MR. BALLIRO:  May I show these to the jury, your Honor?

MR. GAFFNEY:  Wait a minute.  I want to be heard on that, your Honor.

THE COURT:  All right.  Side bench.

(Bench conference recorded as follows:)

THE COURT:  Now, before we start, have we got

them all numbered?

THE CLERK: Yes, Exhibits 20, 21, 22, 23, and 24.

THE COURT: Yes.

MR. GAFFNEY: My objection, your Honor, is I assume Mr. Balliro is going to show them in separate groups for the purpose of trying to show that they are not the same.

Now, I am saying that my objection is that he is taking this out of context because first of all, he hasn't laid a basis as to how these pictures were selected by this witness; and, secondly, if he does lay that basis, it will be shown that all of these pictures were laid out in one group and from that one group, he picked out one photograph of Blodgett, and I am saying that the way he is doing this now, first of all, there is no basis; and, secondly, it is objectionable because it is taken out of context.

THE COURT: Well, as to the five pictures, my understanding is that he said those five have some resemblance.

MR. BALLIRO: Some hair characteristics.

THE COURT: Some what?

MR. BALLIRO: Hair characteristics, length of

4-111

hair.

THE COURT: Didn't he say something about the chin?

MR. BALLIRO: B-1 has a similar jaw, B-2 has hair the color similar, and B-3, the group of five, the length of the hair was similar.

MR. GAFFNEY: But this is not how he made the selection at the time.

MR. BALLIRO: I don't care how he made the selection.

THE COURT: Wait. Wait. How do you propose to show them to the jury?

MR. BALLIRO: I was going to show them first the picture of Mr. Blodgett that he selected, then I was going to show them at random, but identify them in the manner in which he said they resembled the picture of Blodgett.

THE COURT: Well, was Blodgett's picture taken from a group of 13?

MR. BALLIRO: That's correct.

THE COURT: Then there are a group of ---

THE CLERK: There is one group of five, your Honor, one of Mr. Blodgett, and one containing ---

MR. BALLIRO: One is hair color and one is jaw.

THE COURT: How do you propose to show them?

4-112

MR. BALLIRO: Well, I am ---

THE COURT: Say, "I show you the picture of Blodgett"?

MR. BALLIRO: That's correct.

THE COURT: You have no quarrel with that?

MR. GAFFNEY: Of course not.

MR. BALLIRO: Then I am going to show them the photograph that he says hair the color of which resembled the hair of the driver; then a picture of the man whose jaw he says resembled the jaw of the driver; then I am going to show a group of five pictures of men whose hair length he says was approximately the length of the hair of the driver.

THE COURT: I will allow it.

MR. GAFFNEY: Excuse me. May I be heard?

THE COURT: Yes.

MR. GAFFNEY: He never said that when he was picking them out. Nobody asked, "Do you see a jawbone similar to the driver's and hair," or anything like that. They just put down these pictures.

THE COURT: You mean not now, but when they put them down?

MR. GAFFNEY: Right.

THE COURT: Can't you bring that out in redirect?

4-113

MR. GAFFNEY:  But I think he is taking it out of context now as to what happened at the time he actually made the identification.

MR. BALLIRO:  But the identification as to what he says now, that is what is important, the in-court identification.

MR. GAFFNEY:  I am not moving to suppress based upon that ground.

THE COURT:  All right.  I will allow it.

MR. GAFFNEY:  Note my objection.

(End of bench conference.)

MR. BALLIRO:  May I proceed, your Honor?

THE COURT:  Yes.

MR. BALLIRO:  Mr. Foreman, and ladies and gentlemen:  The first picture that I am going to ask you to look at is Exhibit No. 20, which the witness testified is the picture that he selected from the group of 13 pictures that was presented to him as being the picture of the driver of the car.

Pass that through, please.

Mr. Foreman, and ladies and gentlemen:  I am now going to circulate among you Exhibit No. 21, which is the picture selected by the witness as the photograph of a man among that group of 13 that had a jaw similar to the man who

4-114

he says was the driver of the car.

Now, Mr. Foreman, and ladies and gentlemen, Exhibit No. 22 is a photograph of a man selected by the witness out of the group of 13 pictures that he says has hair color similar to the driver of the motor vehicle.

And, Exhibit No. 23, Mr. Foreman, and ladies and gentlemen, is the group of five pictures that the witness has testified represents men whose hair length is similar to the length of the hair of the driver of the motor vehicle that evening.

And Exhibit No. 24, Mr. Foreman, and ladies and gentlemen, represents a group of five pictures which is the balance of the group of 13 pictures that were shown to Mr. Moses.

Would you look at these, please?

(There was a pause in the proceedings while the jurors examined the exhibits.)

Q Mr. Moses, each time that you spoke to the police officers concerning a description of the men in the car, did they not ask you to try to recall whether or not there was any particularly distinguishing feature about any of the men?

A Yes.

Q Something that you would be likely to remember?

A I don't remember if they asked that.

4-115

Q    You have no memory of any police officers saying to you, "Bob, think if you can think of a mole or a mark on the face or something that sticks out, something by which you could easily be able to identify any of those men," or anything like that?  Do you remember them saying anything like that to you?

A    Yes.

Q    And did you search your memory at the time to see whether there was anything that particularly stuck out?

A    Yes.

Q    Well, was there anything unusual about the color of the hair of the man who was the driver?

A    Nothing unusual.

Q    You described it as being light blond?

A    Yes.

Q    And on two occasions you described it as being curly?

A    Yes.

Q    But now you say you didn't mean curly?

A    Yes.

Q    Did you ever tell any of the police officers that you didn't mean curly, that you meant wavy instead?

A    I don't remember.

Q    Well, was there anything unusual about the length of the hair?  Did you feel that was particularly unusual about the

4-116

length as you have described it in your testimony?

A No.

Q And again you say it was just above the shoulders, is that correct?

A Yes.

Q How about the hairline? Was there anything unusual about the hairline let's say of the driver of that motor vehicle that made a lasting impression on your mind?

A No.

Q How about the eyes?

A No.

Q The color of the eyes?

A No.

Q Do you remember the color of the eyes?

A No.

Q You were pretty close to that man for a long period of time, isn't that correct?

A Yes.

Q And you had an excellent opportunity to view that man, isn't that correct?

A Yes.

Q But you don't remember the color of the eyes, is that right?

A Yes.

Q Was there anything unusual about the shape of the eyebrows?

4-117

A    (Pause.)  They are prominent.

Q    Were they prominent on the driver of the car?

A    (Pause.)  Well, as they are, yes.

Q    I ask you, sir, with respect to the driver of the motor vehicle that you observed that night, did that man have prominent eyebrows?

A    Yes.

Q    But you never told that to the police even though on a number of occasions they asked you to give them whatever description you could that would help them identify that man, is that right?

A    Yes.

Q    You never told them that the man had prominent eyebrows?

A    No.

Q    You look at the defendant sitting here now and you see that he has prominent eyebrows, is that correct?

A    Yes.

Q    Would you say they are light eyebrows or dark eyebrows?

A    Light.

Q    How about the shape of the nose of the driver of the car, Mr. Moses, was there anything unusual about the nose?

A    No.

Q    The shape of his mouth?

A    No.

4-118

Q   How about his teeth, did you notice anything unusual about his teeth?

A   No.

Q   Whether there were any gold fillings in the teeth?

A   No.

Q   Or whether any teeth were missing'

A   No.

Q   You didn't notice whether or not any teeth were missing?

A   No.

Q   Did the man have bad teeth or good teeth as we generally speak in terms of teeth?

A   I don't know.

Q   Do you think you would have noticed if he had any teeth missing?

MR. GAFFNEY:   Objection.

THE COURT:   Sustained.

Q   You didn't notice whether or not the man who was driving had any missing teeth?

MR. GAFFNEY:   Objection.   He already said, "No."

Q   Did the driver of the car have any teeth that were missing?

A   I don't know.

MR. GAFFNEY:   Objection.

THE COURT:   Sustained.   The question has been asked before.

4-119

Q    Well, Mr. Moses, you have testified, have you not, that the two men in the front seat were giggling at various times, is that right?

A    Yes.

Q    And they were laughing at times, isn't that right?

A    Yes.

Q    And that the driver of the car was grinning, isn't that what you said?

A    Yes.

Q    Now, would you describe to his Honor and the members of the jury what you mean by, "grinning"?

A    He was smiling.

Q    His teeth were exposed when he was smiling, isn't that correct?

A    Yes.

Q    And you didn't notice any missing teeth, did you?

A    No.

MR. BALLIRO:  Would you stand up, Mr. Blodgett?

MR. GAFFNEY:  I object to this, your Honor.

THE COURT:  Wait a minute.  I don't know what is going to happen.

MR. BALLIRO:  May we approach the side bench, your Honor?

THE COURT:  You may.

(Bench conference recorded as follows:)

MR. BALLIRO: I want him to grin.

THE COURT: Now?

MR. BALLIRO: Now.

THE COURT: Two years afterwards?

MR. BALLIRO: Well, I am going to introduce evidence that the state of his teeth now with respect to the tooth missing is the same now as it was then.

THE COURT: I will allow you to do it after I hear that evidence, not now.

MR. BALLIRO: I will have to put the defendant on the stand to do that.

THE COURT: No, you don't.

MR. BALLIRO: I want to put him on the stand. That is the way I intend ---

THE COURT: I am not going to let you on the present state of the evidence to let him show what his mouth condition is today without some evidence of two years ago what was the condition of his teeth.

MR. BALLIRO: Well, I am relating to it while this witness is on the stand. I intend to introduce evidence, not only from the dentist, but from a number of people, including a dentist, as to what the condition of his teeth were with respect to teeth missing at that

4-121

time in March of 1975.

THE COURT: What do you want him to do now?

MR. BALLIRO: I want this witness to see if that man has a missing tooth.

THE COURT: It is not for this witness. It is for the jury to say. He says he doesn't know.

At this present state of the case, no. I won't allow it.

MR. BALLIRO: My exception.

THE COURT: Yes.

Exception No. 4-7.

(End of bench conference.)

THE COURT: Mr. Foreman, and ladies and gentlemen: If any of you want to take a recess at this time, simply indicate by raising your hands.

We will be in recess for five minutes.

(The afternoon recess was taken from 3:02 p.m. until 3:15 p.m.)

Q  Mr. Moses, for how long a period of time out of that 45 minutes to an hour approximately, of course, period of time that you were in the motor vehicle would you say that you had an opportunity to observe the driver of the automobile grinning?

A  (Pause.) Maybe five or ten seconds.

4-122

Q    And, of course, that was from a very close distance, a couple of feet or closer?

A    Yes.

Q    Now, you have testified that one of the distinguishing characteristics was a prominent jawbone of the driver of the motor vehicle, is that correct?

A    Yes.

Q    How about the driver's Adam's apple, did you observe that at all?

A    No.

Q    Nothing unusual about his Adam's apple?

A    (Pause.)  Was that a question?

Q    Yes.  There was nothing unusual about his Adam's apple?

A    No.

Q    Now, in spite of the fact that there didn't appear, other than the jawbone to be unusual, Mr. Moses, but you still say that that man sitting there, John Blodgett, was the driver of the automobile?

        MR. GAFFNEY:  Objection.

        THE COURT:  What is the objection?

        MR. GAFFNEY:  The form of the question.

        THE COURT:  Sustained in that form.

Q    Is it your testimony in spite of that that Mr. Blodgett is the man that was driving that car?

4-123

A    Yes.

Q    Are you not willing to concede, Mr. Moses, that you could be mistaken?

MR. GAFFNEY:  Objection.

THE COURT:  Sustained.

Q    Can't you not be mistaken, Mr. Moses?

A    No.

Q    You won't leave room for being mistaken?

MR. GAFFNEY:  Objection.

THE COURT:  I will allow that.

THE WITNESS:  No.

MR. BALLIRO:  That is all.

MR. GAFFNEY:  Are you through?

MR. BALLIRO:  Yes.

Redirect Examination

Q    (By Mr. Gaffney)  Will you tell his Honor and the jury, Mr. Moses, what the basis of your identification of this man here, John Blodgett, as the driver of that car is?

A    The person I saw in the car that night.

Q    You are basing it upon the memory that you have today of that man in the car on March 22d, 1975, as being this man right here (indicating)?

A    Yes.

Q    When you selected the photograph from those 13 that Mr.

4-124

Balliro showed you that are in evidence here, was it your memory that you saw the man in the car that enabled you to select that photograph?

A    Yes.

Q    Now, was there other similarities other than what you have already told Mr. Balliro -- strike that out. Were there other similarities?

        MR. BALLIRO:  I object.

        THE COURT:  Don't answer.

        In that form, sustained.

        MR. GAFFNEY:  I withdraw it, your Honor.

        THE COURT:  Very well.

Q    You said you looked through a book of 250 photos at the Boston City Hospital on March 22, 1975, is that correct?

A    Yes -- no.  That was on a Sunday.

Q    On a Sunday?

A    At the Brigham.

Q    Were you shown the book on Saturday?

A    Yes, but we looked through it on Sunday.

Q    You said you were shown a book on Saturday.

A    I was.

Q    But you could not go through that book?

A    Yes.

Q    What was the reason that you couldn't go through the book?

4-125

MR. BALLIRO:  I object.

THE COURT:  I will allow it.

MR. BALLIRO:  My exception.

THE COURT:  Yes.

Exception No. 4-8.

THE WITNESS:  I think it was because of my condition.

MR. BALLIRO:  No.  I object, if your Honor pleases, to anything beyond, "I think."

THE COURT:  Strike the question.  Strike the answer.  Start again.

Q  What was your condition at the time that the police showed you the book with 250 photos the first time?

A  (Pause.)  I was pretty sick.

Q  So you didn't look at the pictures?

MR. BALLIRO:  I object, your Honor.

MR. GAFFNEY:  I will withdraw that.

Q  Did you look at the 250 photos that were in the book that were shown to you the first time?

A  No.

Q  Now, the following day, did you look at a book with 250 photos in it?

A  Yes.

Q  And did you pick out any pictures of those 250 that looked

4-126

like this man here, John Blodgett, of the 250 photos?

MR. BALLIRO:  I object, your Honor.

THE COURT:  I will allow it.

MR. BALLIRO:  May I be heard at the bench, your Honor?

THE COURT:  Yes.

(Bench conference recorded as follows:)

THE COURT:  Yes?

MR. BALLIRO:  In view of the fact that the Commonwealth has represented to the Court that they don't have those pictures, and there is no way we can get those pictures, I suggest that it is tremendously unfair to elicit an answer that might be based upon the fact of some resemblance of whatever it might be.  I can't cross-examine this man based on misrepresentations.

THE COURT:  What do you say?

MR. GAFFNEY:  I will withdraw that question.

THE COURT:  Very well.

(End of bench conference.)

Q  Of the 250 photos that you looked at in this book on Sunday, March 23d, 1975, did you pick out any of those 250 photos that you said was John Blodgett or was the operator of the car?

MR. BALLIRO:  I object, your Honor.

4-127

THE COURT: Sustained in view of what was said by the Court at the bench.

Q    Did you pick out any photo of the 250 ---

THE COURT: Wait a minute.

I should have said to the judge, not by the judge, at the bench.

Go ahead.

Q    Did you pick out any photo from the 250 that you identified as being the operator of the car?

MR. BALLIRO: I object, your Honor.

THE COURT: Same reason; sustained.

Q    Tell us what you did.

MR. BALLIRO: I object.

THE COURT: I will allow that.

MR. BALLIRO: My exception.

Exception No. 4-9.

THE COURT: I will allow that.

THE WITNESS: Well, I remember picking out one picture. It was of Shaughnessy. One was a man who had a mouth that looked like Shaughnessy's.

MR. BALLIRO: I move to strike those answers, your Honor.

THE COURT: I will allow those answers to be stricken. I will not allow him to proceed in regard to

4-128

anything else in view of the situation that has been explained at the bench.

Q When was the first time that you picked out a photograph that you identified as being the operator of the motor vehicle on March 22d, 1975?

MR. BALLIRO: I will object, if your Honor pleases.

THE COURT: I will allow it.

MR. BALLIRO: My exception.

Exception No. 4-10.

THE WITNESS: It was on Thursday.

Q Do you remember the date?

MR. BALLIRO: I object, your Honor.

THE COURT: I will allow that.

MR. BALLIRO: My exception.

Exception No. 4-11.

THE WITNESS: The 27th of March.

Q Now, out of the 250 photos that were shown to you in this book, did you select any that you identified or looked like the two persons in the back seat of the car?

MR. BALLIRO: Your Honor, I object.

THE COURT: Sustained for the same reason.

MR. GAFFNEY: I don't think we went into that, your Honor.

MR. BALLIRO:  I object to his remark, if your Honor pleases.  I ask that be stricken.

THE COURT:  Side bench.

MR. BALLIRO:  May his remark be stricken, your Honor?

THE COURT:  Side bench.

MR. GAFFNEY:  I withdraw the question.

THE COURT:  Very well.  There is no question. Start again.

Q  At any time during the course of your being shown 250 pictures in the book, or the 13 other photos that are in evidence here, did you make any identifications of anyone other than the two people in the front seat of the motor vehicle?

MR. BALLIRO:  I object.  I have a motion that I would like to address to the Court at the side bench.

THE COURT:  You may.

MR. GAFFNEY:  May I have a ruling on that question, your Honor?

THE COURT:  Yes.  Sustained.

MR. BALLIRO:  I still have a motion which I would like to address to the Court.

THE COURT:  Very well.  You may be heard.

(Bench conference recorded as follows:)

4-130

THE COURT: Before you start, let me put something on the record.

I have sustained several objections to questions concerning the 250 pictures because of the statement made at the bench that those pictures had been divided into certain groups and are now not identifiable and it is now not separable into one group.

Now, I will hear you.

MR. BALLIRO: I have a motion for a mistrial, your Honor.

THE COURT: On this basis?

MR. BALLIRO: No. May I state the basis?

THE COURT: Put it on the record.

MR. BALLIRO: Yes. The basis is that the question put by the Commonwealth to the witness in the witness' selection of the two people as being in the front seat of the car on the 250 pictures that your Honor has repeatedly ruled in this sequence of questioning that he could not go into.

Now, I submit that the whole tenure of his questions and the last question to which I objected and moved for a mistrial on conveys improperly to this jury that an identification was made out of that group of 250 pictures.

Additionally, I say to your Honor that all of

this was gone into on direct examination. There is no new material here for redirect examination purposes.

MR. GAFFNEY: That was covered by you in cross.

MR. BALLIRO: Right.

MR. GAFFNEY: I didn't go into anything about the 250 pictures on my direct examination, and I am entitled to cover as much as necessary on the cross-examination of the 250 that he covered on cross-examination ---

MR. BALLIRO: May this ---

THE COURT: Wait a minute.

MR. GAFFNEY: --- of the 250 pictures.

THE COURT: One at a time.

MR. GAFFNEY: I submit, your Honor, that it is perfectly permissible examination.

THE COURT: Ordinarily, I would agree with you, but because now the 250 pictures have been taken from one book and put into three, they are not separable. That is the sole reason why I feel that you can't go into those 250 pictures either on direct examination or on redirect examination.

That is my ruling. Your motion for a mistrial is denied.

MR. BALLIRO: May the jury be instructed to disregard any inference or suggestion contained in the

4-132

Question of Mr. Gaffney to the witness?

THE COURT: Not at this time. I will not do it.

MR. BALLIRO: My exception.

Exception No. 4-12.

(End of bench conference.)

Q Mr. Moses, you were shown a group of 13 photos on March 27th, 1975, at the Peter Bent Brigham Hospital, is that correct?

A Yes.

MR. GAFFNEY: Those are now marked Exhibits 20, 21, 22, 23, and 24.

Q What was your condition at that time when you were shown those photographs?

MR. BALLIRO: I object, your Honor.

THE COURT: I will allow it.

MR. BALLIRO: My exception.

Exception No. 4-13.

THE WITNESS: (No response.)

MR. GAFFNEY: Let me withdraw that question.

Q Will you tell us whether or not your arms or hands were in any particular type of splint or were you able ---

(Mr. Balliro rose from his seat.)

MR. GAFFNEY: All right. I will withdraw that.

Q Will you describe what your condition was at that time ---

MR. BALLIRO: I object.

4-133

Q   --- on March 27, 1975?

THE COURT:  I will allow it.

MR. BALLIRO:  My exception.

Exception No. 4-14.

THE WITNESS:  Well, I was lying in bed and both of my arms were wrapped up and hanging up like so on two poles (indicating).

Q   Did you have the ability or were you able to handle 13 photos yourself at that time?

A   No.

Q   Will you describe to his Honor and the jury the manner in which these photographs were displayed to you then to enable you to select   the photograph that you did?

MR. BALLIRO:  I object, your Honor.

THE COURT:  I will allow it.

MR. BALLIRO:  My exception.

THE COURT:  Yes.

Exception No. 4-15.

THE WITNESS:  They were laid on the bed and -- they were just laid down on the bed in front of me.

Q   Were all 13 laid on the bed at one time?

A   Yes.

Q   Will you tell us how you selected -- the manner in which you selected this photograph from the 13?

4-134

A   I told the officers which one it was.

Q   By that do you mean you directed them to the row and the particular picture?

A   Yes.

Q   And this is the photograph you selected from the 13?

A   Yes.

Q   Exhibit 20.

Now, in cross-examination Mr. Balliro showed you this knife, Exhibit No. 19.  Will you tell us what there is about this knife that you can identify it as looking like the knife you saw in the hand of this defendant on March 22, 1975?

A   The appearance of the blade.

Q   What do you mean, "the appearance of the blade"?

A   That it was about that long and that wide.

Q   And that is the basis of your identification?

A   Yeah.

Q   Were you able to see the handle of the knife?

A   No.

Q   And how was the defendant holding this knife when you observed it on March 22d, 1975?  Will you describe that?

A   Like so (indicating).

Q   Mr. Witness, you are holding your hand over the handle, is that correct?

4-135

A    Yes.

MR. GAFFNEY:  I have nothing further, your Honor.

MR. BALLIRO:  May I see those again, please, the picture of Mr. Blodgett?

### Recross-Examination

Q    (By Mr. Balliro)  Mr. Moses, in Exhibit No. 20, does that picture portray a man who in your opinion is younger or older than the man who was driving the car?

A    (Pause.)  Younger.

Q    How much younger in your opinion?

A    About a year or two.

Q    How old would you approximate the man in the picture to be?

A    22.

MR. BALLIRO:  That is all.

MR. GAFFNEY:  That is all.  Thank you very much.

THE COURT:  You are excused.

(Witness steps down.)

MR. GAFFNEY:  Sergeant Childers, please.

### RUSSELL CHILDERS, Sworn

### Direct Examination

Q    (By Mr. Gaffney)  State your full name, please?

A    My name is Russell Childers, C-h-i-l-d-e-r-s.

Q    Are you a police sergeant, Boston Police Department?

A    Yes, sir.  I am.

4-136

Q    And in 1975, where were you stationed, sir?

A    I was stationed at District 6 in South Boston.

Q    At sometime in 1975, Sergeant Childers, were you assigned to conduct an investigation into this case?

A    Yes, sir, I was.

Q    When were you so assigned?

A    Sunday, March 23d, 1975.

Q    What was the first thing you did after you were assigned to this investigation on March 23d, 1975?

A    I went -- earlier in the day I went to the Peter Bent Brigham Hospital to see a Mr. Moses.

Q    What was the next thing you did?

A    I left the hospital at that time and come back to District 6 and I went into the police garage and I observed a motor vehicle.

Q    I show you Exhibits 3, 4, and 8, and ask you whether or not you can identify the vehicle shown in those three photographs, sir?

A    Yes.  This is the car that was in the police garage at District 6 in South Boston.

Q    Now, did you make any observations as to the exterior or outside of that motor vehicle, that Monte Carlo?

A    Yes, sir, I did.

Q    What did you observe, sir?

4-137

A   I observed -- on the trunk there appeared to be red stains
which appeared to be human blood.

Q   Where was that located?

A   On the trunk of the vehicle.

Q   How many stains did you observe?

A   There was numerous stains.

Q   Numerous stains?

A   Numerous stains; two larger ones, and there was a lot of
small ones.

Q   Did you make any other observations as to any other portion
of the exterior of that motor vehicle?

A   The exterior, no.

Q   Now, did you examine the interior of that motor vehicle?

A   Yes, sir, I did.

Q   What did you find there, sir?

A   I found that the vehicle was completely burned inside,
including the seats, floormats, dashboard, steering wheel,
all the upholstery.  The only thing that was not burned
that I could see was the keys hanging in the ignition.

Q   And I show you these keys, Exhibit No. 14, and I ask you
if you recognize those, sir?

A   Yes, sir, I do.

Q   What do you recognize them as?

A   I recognize these as the keys that were in the ignition of

4-138

this burned-out vehicle -- two automobile keys and three house keys, one with a piece of Scotch tape on one of them that I put on myself.

Q   All right.  Now, what else did you observe in the interior of that 1970 motor vehicle?

A   I observed a couple of inches of water in the back seat where the back seat was, and I went fishing in with my both hands and I found a wallet with some identification in it.

Q   Were there any papers in the wallet?

A   Yes, sir, there was.

Q   Was there a name on the papers?

A   Yes, sir.

Q   What name did you observe?

A   John Asinari.

Q   Will you look at that, sergeant, and tell us whether or not that is the wallet that you found in the back seat of this 1970 Chevrolet Monte Carlo?

A   Yes, sir, it is.

Q   Is there still identification papers in there?

A   Yes, sir, John L. Asinari.

Q   Were these papers also in there?

A   They were in the wallet, yes.

MR. GAFFNEY:  I would like to offer this.

THE COURT:  It may be marked Exhibit No. 25.

THE CLERK: May they be placed in an envelope for the purpose of identification?

THE COURT: Yes. The wallet and papers may be marked as Exhibit No. 25.

(The aforementioned wallet and papers were placed in an envelope which was marked Exhibit No. 25 and were received in evidence.)

MR. GAFFNEY: May I show these to the jury, your Honor please?

THE COURT: Yes. Walk by. You hold it in your hands and walk by.

MR. GAFFNEY: This is Exhibit No. 25.

(Mr. Gaffney walked along the jury box.)

Q   What else did you find in the interior of that car?

A   I don't believe I found anything else at that time.

Q   Did you examine the front seat -- underneath the front seat?

A   Yes, sir.

Q   What did you find under there?

A   Under that front seat I found another license plate.

Q   And did you make further examination of the car?

A   Yes, sir, I did.

Q   What examination did you make?

4-140

A    I examined the trunk.

Q    What did you observe there?

A    I observed the spare tire was missing and the bumper jack was missing.

Q    And with reference to the keys, Exhibit No. 14, what did you do with those, sir?

A    I took them from the ignition and I tagged them, date, and signed my name to the tag.

Q    And what did you do?

A    I inquired into the ownership and found the owner of the car Mr. Frazer, who lived in Malden.  I sent a detective to Mr. Frazer's house requesting Mr. Frazer to come to District 6, which he did.

Q    And did he  make some determination as to those particular keys, sir?

A    Did he make some?

Q    Yes.

A    Yes, he did.

Q    Will you tell us what happened?

A    I showed him the keys and he stated to me that the two automobile keys were probably his, but the three house keys and the ring were not his.

Q    Was there some other information obtained from Mr. Frazer as to anything else that was contained in this vehicle at

4-141

the time that he last saw it?

A    Yes, sir.  He said he had tennis rackets in the trunk.  He had an umbrella and a white baby seat.

Q    Is that the same baby seat that is in evidence here?

A    Yes, sir.

Q    Now, did you do something with reference to those three keys or any of those three keys that Mr. Frazer identified as not belonging to him?

A    Yes, sir, I did.

Q    On Exhibit No. 14?

A    I did.

Q    Will you tell us what you did, sir?

A    I tried these keys in the various houses over the weekend up until Wednesday, the following Wednesday, in the South Boston area.

Q    Then what did you do?

A    On Wednesday, March 26th, as a result of information received, I went to the Methuen Police Department.  From the Methuen Police Department, myself and my partner went to 33 French Street in Methuen accompanied by the Methuen Police Department.

Q    What did you do at 33 French Street?

A    I looked in the window of the first floor apartment.  I observed it was vacant.  I took this key with the Scotch

4-142

tape on it and inserted it into the lock and it opened the door.

Q  Is that the same lock that is in evidence here, Exhibit No. 6, sir?

A  Yes, sir, it is.

Q  And how did you obtain that lock in order to have it available here for court?

A  The owner of the house and his wife arrived and after a conversation with myself and other officers, he agreed that I could take the lock out of the door, which I did. Before I took it out ---

MR. BALLIRO:  You know, we can stipulate that is the lock and those are Mr. Blodgett's keys, and I suggest respectfully we are taking an awful lot of time for matters that can be stipulated to.

MR. GAFFNEY:  I would be glad to stipulate.

Q  Were you the one, sergeant, that showed these 13 pictures to the previous witness, Robert Moses?

A  Yes, sir.

Q  And that was on March 27th?

A  Correct.

Q  1975?  And how many pictures out of the 13 were selected by Mr. Moses?

A  One.

4-143

Q   And that was selected as being which person in the car?

A   As the driver of the automobile.

Q   At some time, sergeant, did you and another police officer go to Houston, Texas, in connection with this case?

A   Yes, sir, I did.

Q   And when you went to Houston, Texas, did you observe somebody there?

A   Yes, sir, I did.

Q   Who did you observe?

A   The defendant John Blodgett.

Q   And was he -- did you -- was he under the name of John Blodgett when you first saw the defendant there?

A   No, sir.

Q   Where was this?

A   Houston, Texas.

Q   What place was that?

A   In the jail.

Q   What place?

A   Right in Houston; Houston, Texas.

Q   What name was the defendant under?

A   Carl Hoffman.

Q   And did you come back from Houston to bring the defendant back from Houston, Texas, to Boston?

A   Yes, sir, I did.

4-144

Q    And on what date was that?

A    March 18th, 1977.

MR. GAFFNEY:  You may inquire.

Cross-Examination

Q    (By Mr. Balliro)  How long have you been a police officer, Sergeant Childers?

A    27 years, 6 months.

Q    And you have participated in a great number of investigations during those 26 years?

A    Yes, sir, I have.

Q    And during the course of those many investigations, many times you were involved in displaying photographs to victims of crimes?

A    Yes, sir, I have.

Q    With the purpose of seeing whether they could identify a suspect?

A    That's correct.

Q    And conducting line-ups and show-ups?

A    Yes, sir.

Q    And would you say that you have done that countless numbers of times?

A    On photographs, yes; line-ups, not too many times.

Q    But on photographs, maybe hundreds of times in the last 26 years?

A    Possibly, yes.

Q    And do you try to conduct those photographic showings in a fair manner?

A    Yes, sir.

Q    And in the process of trying to do it in a fair manner, when you select a picture of a suspect to put among the group of photographs to show to the victim of an offense, do you try to pick pictures of men that look pretty much the same so that the process is a fairer one?

MR. GAFFNEY:  Is that a question?

MR. BALLIRO:  Yes.

MR. GAFFNEY:  I object to the question.  I thought it was a speech, your Honor.

THE COURT:  No comment.  Do you object?

MR. GAFFNEY:  Yes, sir, I do.

THE COURT:  You have two questions in one if I may suggest.  Sustained.

Q    Sergeant Childers, is it your practice when you select groups of photographs that contain a photograph of a suspect to show to the victim of an offense to select pictures that have characteristics that resemble each other?

A    Facial characteristics?

Q    Yes.

A    No.

4-146

Q    That is not your practice?

A    No, positively not.

Q    I see.  Well, tell us what your practice is with respect to putting pictures together for a photographic display.

A    My practice always has been that perhaps as many as eight to ten -- at least eight to ten --photos are shown to a victim with approximate color and age and neighborhood.

Q    And did you follow that practice with respect to the 13 pictures represented by Exhibits 20 through 24?

A    I did not select those photos, but I would say that isn't too bad.

Q    Who selected the photos?

A    Detective Maguire.

Q    Were you with him when he selected the photos?

A    No.  I was in the same room as him.

Q    I see.  Well, did you go over the 13 pictures with him to see whether or not in accordance with your practice you felt there was going to be a fair showing to the victim?

A    No.  I instructed him what to do.

Q    I see.  So that you didn't look at them at all before they were shown to Mr. Moses?

A    I saw them when they were at the hospital.

Q    At the same time that he saw them?

A    Yes, sir.

4-147

Q    And you felt that they were fair?

A    Yes, sir; more than fair.

Q    More than fair.

MR. BALLIRO:    That is all.

### Redirect Examination

Q    (By Mr. Gaffney)    How many of those pictures of the 13 had light hair, sergeant?

A    Unless you know a person personally, it is very difficult to tell.

MR. BALLIRO:    I move that that answer be stricken, your Honor.

THE COURT:    I will strike the first part of that answer.    I will let stand that part that says, "It is very difficult to tell."

Q    Did you finish giving your answer?

MR. GAFFNEY:    Did you strike the answer, your Honor?

THE COURT:    I didn't strike all of it.    I struck part of it.    What is left standing is, "It is very difficult to tell."

Q    Well, do you know some of these men personally, sergeant?

A    Yes, sir, I do.

Q    That are shown in these 13 pictures?

A    Yes, I do.

Q     Do you know whether or not any of them have blond hair?

MR. BALLIRO:  I object, your Honor.

THE COURT:  I will hear you on your objection, but at the bench.

(Bench conference recorded as follows:)

MR. BALLIRO:  Your Honor, it is irrelevant whether or not in fact they have light hair or blond hair.  The people themselves were being shown to him; that is the only thing that is relevant.  What do the pictures show, not people with light hair, but what do the pictures show?  That is the basis for my objection. It is not a question of whether these 13 had light hair or not as shown in the picture.  It is the picture that counts, and not what the man actually looked like.  He might have light hair.  It might have been red in the picture.  What difference does it make if the man had blond hair and in fact in the picture he has red hair?

THE COURT:  Well, so much for that question having to do with whether or not the pictures shows it was light hair.

I will sustain the objection.

MR. BALLIRO:  Thank you.

(End of bench conference.)

MR. GAFFNEY:  I have no further questions.

4-149

THE COURT:  Thank you.

MR. BALLIRO:  That is all, your Honor.

THE COURT:  You are excused, sergeant.

(Witness steps down.)

THE COURT:  Do you want to start with another witness?

MR. GAFFNEY:  That is all the witnesses I have for today.

THE COURT:  Very well.

It is five minutes of 4:00, Mr. Foreman, and ladies and gentlemen of the jury.

It may be tiresome to hear my repetition each night about what you are to do or are not to do, and even though it is repetitive, even though it is tiresome, it is essential in the Court's judgment that you follow my requests.  Now, don't talk about the case.  Don't come to any premature opinions or judgments.  Don't pay any attention to anything that you may see or read or hear.  This is to preserve the very idea for which you are here, and that is to give everybody concerned a fair trial.

With that in mind, I will see you tomorrow morning.  You come in the same entrance you came in this morning, and I will see you tomorrow morning at

SUPPLEMENTAL APPENDIX "C"

complete lobby conference In re:  rights of dead Shaughnessy
vs rights of Blodgett      14 pages

(only transcript numbering)

Wednesday, June 22, 1977

P R O C E E D I N G S

(The following occurred in the Judge's lobby.)

THE COURT: Let the record show we are meeting at the request of counsel here in the lobby. The presence of the defendant is waived. Is that correct, Mr. Balliro?

MR. BALLIRO: That's correct.

THE COURT: And that Mr. Balliro wishes to put something on the record.

MR. BALLIRO: Your Honor, I want to direct the Court's attention to an article that appears in this morning's Boston Globe, Wednesday morning, June 22d, 1977. It's a front page article that carries the caption "Witness relives a ride of terror" and the article was written by Alan H. Sheehan of the Globe staff. The article begins on Page 1 and is continued on Page 15, and in addition to recounting, in part at least, the testimony of witnesses that appeared on the witness stand yesterday, it carries in

5-4

parenthesis at the beginning of Page 15 the following, "Shaughnessy later hanged himself in Charles Street Jail" closed parenthesis.

I am sure your Honor recalls from the testimony on this case that Shaughnessy is repeated to have been the passenger in the front seat of the car, he was referred to by name by the witness Robert Moses, who testified yesterday. Additionally, there was some mention made, as I recall it by the District Attorney in his opening concerning the fact that Shaughnessy was dead.

I have no objection to the relating of the fact that Shaughnessy is dead and expect that the Court will instruct the jury that in no way shoul any inference adverse to the defendant be drawn from that, but what I do now request the Court to do is the following: To inquire of the jury panel as to whether or not they have read last evening's and this morning's Boston Globe. I ha\ not seen last evening's Globe, but I know that ordinarily the morning edition carries more or less a replay of the evening edition. And if they indicate that they have, to then inquire of them as to whether or not they read anything

concerning Mr. Shaughnessy. And if any jurors reply in the affirmative, I would then ask the Court to take those jurors into chambers individually and inquire of them as to what they read, and if they read that Mr. Shaughnessy hanged himself in the cell to then put such questions to them as the Court deems in its discretion necessary to determine whether or not they are still free from prejudice and can judge the guilt or innocence of the defendant fairly. I would then request that the Court instruct them to not discuss the fact that Shaughnessy had hanged himself with any of the other jurors, not to relate what takes place in your questioning of them in chambers.

THE COURT: Mr. Gaffney, do you have any comment?

MR. GAFFNEY: I can understand the concern of Mr. Balliro for his client's rights, your Honor. I don't feel that his rights have been prejudiced in any way by the factual reporting of the case and the mention of Mr. Shaughnessy's death. I do feel that if the Court inquires into the nature of this reporting that it might place

5-(

undue emphasis on this particular statement that Mr. Balliro objects to.

THE COURT: All right. What do you say about the stipulation we have on Shaughnessy's death?

MR. GAFFNEY: I would like to have Mr. Balliro agree that I could state to the Court and the jury that Robert M. Shaughnessy, 161 West Third Street, South Boston, Mass., died on November 11, 1975.

MR. BALLIRO: I am willing to stipulate, but I would ask the Court to contemporaneously, with the making of that stipulation, to instruct the jury that they are to draw no inference adverse to the defendant, and I suggest that the meaning-fulness of the instruction in that regard -- in order for an instruction in that regard to be meaningful that it ought to accompany the giving of the stipulation to the jury rather than waitin until the charge. As a matter of fact, I think it ought to be repeated in the charge.

THE COURT: Okay. Anything else? All right, I will excuse you. I will think about these problems.

(End of lobby conference.)

(The jury entered the courtroom.)

THE COURT:   Good morning.

THE CLERK:   Your Honor, may the jury be polled?

THE COURT:   It may.

(Jury polled; defendant polled.)

THE CLERK:   Your Honor, in addition to the defendant and the sixteen jurors, may the record also indicate the defendant's attorney, Mr. Joseph Balliro, is present, and that Mr. John Gaffney, Assistant District Attorney, is present on behalf of the Commonwealth.

THE COURT:   Thank you.

Mr. Foreman, ladies and gentlemen of the jury: You will recall that each night when I have bid you good-night I have said to you, I have given you certain instructions in regard to your conduct in reference to this trial, and I remember last night I said to you in repeating those instructions that they were repetitive, they might be tiresome, but that they were extremely important for you to observe.

Now, there has been some publicity about this matter in the press and in the media, and of course there has to be a recognition and a full compliance with the rights under the First Amendment of a free press and the

5-8

right of the defendant to have a fair trial. That's what you're here for, to see that the fair trial requirement is met fully.

I comment that publicity necessarily is not limited to that which must govern your deliberations, and that is to limit yourself to that which you hear in the courtroom, and nothing else. Reports in the media may include references to occurrences or events or observations that do not come to your attention in the courtroom. Of course, you are mature adults in the various communities in Suffolk County, and by your oaths you are to see to it that this defendant in the Commonwealth gets a fair, impartial, unbiased trial. You will disregard anything except that which you hear from this witness stand or from comments of counsel or instructions from the judge at the appropriate time as to what the law is. The fairness of a jury trial is the most important thing in the administration of criminal justice, not only in this county, this Commonwealth and this country. And I know that you will adhere to my instructions and be governed accordingly.

You may proceed.

MR. BALLIRO: May we approach the side bar, your Honor?

5-9

THE COURT:  Yes.

(BENCH CONFERENCE:

MR. BALLIRO:  I just want to take exception, your Honor, to the Court's refusal to follow the procedure in substance at least of that which I suggested in chambers.

THE COURT:  Yes.  Your exception is noted.

EXCEPTION NO. 5-1

THE COURT: And now after you enter this stipulation concerning Shaughnessy, I will say something else about that.

MR. BALLIRO:  Thank you, your Honor.

(End of bench conference.)

MR. GAFFNEY:  If it please the Court, it has been stipulated by counsel that Robert M. Shaughnessy, of 161 West Third Street, South Boston, Massachusetts, died on November 11, 1975.

THE COURT:  Thank you.

Again, Mr. Foreman and ladies and gentlemen, having in mind that in reference to that stipulation as to the death of Shaughnessy, you are hearing a case against John J. Blodgett, nothing else. And you will not draw any

5-1

inferences against the defendant in any way that are harmful to him or prejudicial to him at all.

MR. BALLIRO:  Thank you, your Honor.

THE COURT:  You may proceed.

MR. GAFFNEY:  May we approach the bench, your Honor?

(BENCH CONFERENCE:

MR. GAFFNEY:  Your Honor, the last statement that you will not draw any harmful inferences against the defendant John Blodgett, shouldn't that be confined to "by the fact that he is deceased?" because it's the Commonwealth's contention this is a joint venture, and the acts of Shaughnessy or the acts of Blodgett, so I don't know whether that particular statement may have affected --

MR. BALLIRO:  I think your statement was in context, your Honor.

THE COURT:  I will cure it right now if there is any curing needed.

MR. BALLIRO:  I don't think there is anything to cure, your Honor.

THE COURT:  Let me think about it.

(End of bench conference.)

5-1

Mr. Foreman and ladies and gentlemen, my remarks about the stipulation about the death were limited within the context of that, that you will draw no inferences against the defendant having in mind that the only thing before you at that moment was the fact of the death of Shaughnessy.

MR. GAFFNEY: I am going to offer the Peter Bent Brigham Hospital Record, your Honor.

MR. BALLIRO: I object to them. Your Honor, he now is going to offer a whole bunch of maybe 30 or 40 pages of a hospital record, which I suggest your Honor ought to look at very carefully first because they are unintelligibl I can't make head nor tail out of them, I don't know how anybody else could make head nor tail out of them, and unless a doctor is going to come in and explain all this gibberish, all these chicken scrawls here that make no sens at all, I think it's improper. They can't read them and it can't aide them and they are liable to read things into them that aren't there. I think you would have to read that.

MR. GAFFNEY: I think they are relevant to the case to substantiate the fact that Moses was in the hospital, that he received the stab wounds that he testifie that he did, and I would only read two or three pages.

5-1:

there's a disagreement.

MR. BALLIRO:  In what regard?

THE COURT:  In regard to the admission of hospital records.

MR. BALLIRO:  What I am suggesting is that they first of all are not necessary, and secondly will serve to confuse rather than to aid their understanding of the injuries received by Mr. Moses, who has testified regarding them.  They won't know what this stuff means. I know they are admissible, but I assume a doctor should in the ordinary course take the stand and explain what all of those things mean.  Not that I am saying that that should happen here, but in the absence of it I don't think they can go in anyway.

THE COURT:  All right.  Well now, let me go on for a bit.  On this second page, what do you seek to use?

MR. GAFFNEY: This area here.

THE COURT:  What else?

MR. GAFFNEY:  This is the transfer note from the Boston City Hospital when he was taken from the City Hospital to the Peter Bent Brigham Hospital.

MR. BALLIRO:  A transfer note?

THE COURT:  I will let you see that in a moment.

5-

THE COURT:  Is this all Moses' hospital record?

MR. GAFFNEY:  This is all Moses.

THE COURT:  Show me what you are going to read.

(Document produced.)

THE COURT:  What else?  The statute says they are admissible.

MR. BALLIRO:  First of all, we don't controvert the injuries of Mr. Moses.  At no time will I do that, either in the presentation of evidence or during the course of my summation.  Number two, Mr. Moses has testified and has demonstrated to the jury the scars, and very graphically outlined what happened to him and how he felt in the hospital and the kind of treatment he received.

We are lawyers, your Honor.  We handle court cases.   We might know what myocardial is and third this and fourth that.  You know, jurors I respectfully suggest are laypeople, and don't understand that kind of language.  I don't know what this adds to their understanding, and I suggest respectfully it can only confuse them and they may speculate with respect to these things whether a doctor --

THE COURT:  Well, the statute says hospital records are admissible, and there is no stipulation here

5-14

Here is my ruling. You can have one of these or the other. This transfer note contains all the information relevant to this case. However, if you prefer to read those sections of the hospital record, you may do so, but you may read it as "G.S.W." rather than telling what you think it is.

MR. GAFFNEY:  I know what it is.

THE COURT: I know what it is, but it's G.S.W. Now, I suggest the transfer note covers everything you need, with the exclusion of that part in parenthesis.

MR. GAFFNEY:  Yes, your Honor. I will read the transfer note.

MR. BALLIRO:  My exception.

EXCEPTION NO. 5-2

THE COURT:  And that is part of the hospital record.  Is there any objection?

MR. GAFFNEY:  I am offering the hospital record first.

MR. BALLIRO:  Well, wait a minute. I don't understand now.  Are you offering everything else too?

MR. GAFFNEY:  I am going to offer the hospital records so they will be an exhibit.  Then I will read this transfer note.

MR. BALLIRO:  Oh, I object to the hospital record

5-15

THE COURT:  Do you raise any question that the transfer note is not part of the hospital record?

MR. BALLIRO:  No, I don't.

THE COURT:  I will allow the entire record to be introduced and marked, but only so much as is included in the transfer note read to the jury, and I will not allow the hospital record out.

MR. BALLIRO:  Okay.

MR. GAFFNEY:  Judge, one more thing. I would like to be able to state that the record shows that he was in the hospital from 3/22/75 to 4/2/75.

MR. BALLIRO:  I have no objection.

THE COURT: You may.  Very well.

MR. GAFFNEY:  Your Honor, I would like to offer at this time the records from the Peter Bent Brigham Hospital on Robert Moses.

THE COURT:  Exhibit 26.

THE CLERK:  Your Honor, for the purpose of identification may they be placed in an envelope and marked?

THE COURT:  They may.

(Peter Bent Brigham Hospital Record of Robert Moses marked Exhibit No. 26 in evidence.)

MR. GAFFNEY:  Your Honor, may I read the transfer note which is included in the Peter Bent Brigham Hospital

5-16

Record?

THE COURT: You may.

MR. GAFFNEY: This is the transfer note from the Boston City Hospital to the Peter Bent Brigham Hospital, dated March 22, 1975. The record in this case of Peter Bent Brigham Hospital would show that Robert Moses was a patient of the Peter Bent Brigham Hospital from March 22, 1975 to April 2, 1975.

Transfer note: "20 year old M.I.T. student multiple stab wounds, dorsum left hand with exposure extensor tendon, longitudinal laceration tendon, not transected. Wound closed under local NER. Other stab wounds dressed and covered after local cleansing. Bullet in right wrist. FX head metatarsal and carpal bone. X-rays sent. Patient given tetanus toxoid intravenous, something, and penicillin. Recommend early surgical RX. Patient now approximately seven and a half hours post-injury."

May I have a moment, if your Honor please? The witness, I understand, is in another session.

THE COURT: Have the Court Officer go and bring him up here.

MR. BALLIRO: I think we could stipulate, your Honor, with respect to the witness' testimony.